**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| RORRER, et al. | : | CIVIL ACTION |
|      Plaintiffs, | : | |
| | : | |
| | : | |
|      v. | : | No. 08-00671 |
| | : | |
| | : | |
| CLEVELAND STEEL CONTAINER, et al. | : | |
|      Defendants. | : | |

---

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                                    **April 28, 2010**

This case involves a Title VII claim premised upon an alleged hostile work environment.

Currently before the Court are Defendants' motions for summary judgment. For reasons stated

herein, Defendants' motions will be denied in part and granted in part.

## I. <u>BACKGROUND</u>

Plaintiff Lucy Rorrer[1] and Defendant Richard Gilbert, were both employees of Defendant

Cleveland Steel Container Corp., a steel pail manufacturing company. On August 1, 2006, Rorrer

and Gilbert were working together in the spouts department along side a conveyor belt. Rorrer was

running what is referred to as a double fitting machine while Gilbert fed pieces of steel into the

machine. Both employees stopped working while Gilbert used a utility knife to open a new box of

pieces. After opening the box, Rorrer claims that Gilbert reached towards her with the utility knife,

---

[1] The Plaintiffs in this matter are Lucy Rorrer and her husband, Louis Rorrer. For
purposes of this Opinion, "Rorrer" refers only to Lucy Rorrer.

pressed it into her left breast and looked like he was "going to kill her." According to Rorrer, Gilbert had engaged in continuing sexual harassment prior to this incident. Defendant claims that this encounter was innocuous and that Gilbert was simply attempting to get Rorrer's attention to resume work.

Gilbert and Rorrer were separated after Rorrer reported the incident to Phyllis Plate, who Rorrer believed was her supervisor, and Richard Mayo, the Production Control Manager. Rorrer and Gilbert worked several shifts together before Gilbert was suspended for three days on August 7, 2006. Rorrer claims that each time she saw Gilbert she feared for her life. August 8, 2006 was the last day Rorrer went into work. While not physically injured, Rorrer claims to have been traumatized by the event to such an extent that she can no longer work.

On February 12, 2008, Rorrer and her husband, Louis Rorrer, filed suit against Cleveland Steel and Gilbert, seeking compensatory and punitive damages through a variety of claims. Extensive and often contentious discovery followed. Defendants Cleveland Steel and Gilbert filed motions for summary judgment on December 8, 2009.

Specifically, Defendant Cleveland Steel moves for summary judgment on Plaintiffs' claims of: (1) sexual discrimination under Title VII, 42 U.S.C. § 2000 *et seq*. (hostile work environment);[2] (2) ERISA, (3) intentional infliction of emotional distress; (4) negligent employment; and (5) loss of consortium. Defendant Gilbert moves for summary judgement on Plaintiffs' claims of: (1) sexual discrimination under the Pennsylvania Human Relations Act; (2) violation of the Pennsylvania Constitution Article I § 28 and in violation of the public policy of the Commonwealth of

---

[2] Plaintiffs also make a claim under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 953. Claims under PHRA are analyzed under the same framework as claims brought under Title VII. Weston v. Pennsylvania, 251 F.3d 420, 426 n. 3 (3d Cir. 2001).

Pennsylvania; (3) intentional infliction of emotional distress; and (4) loss of consortium.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party moving for summary judgement has the initial burden of supporting its motion with evidence that would be admissible in a trial. Anderson, 477 U.S. at 248. If this requirement is satisfied, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party may meet this burden either by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that the movant's factual evidence is insufficient to establish an essential element of its claims. Celotex, 477 U.S. at 331.

The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present evidence from which a jury could reasonably find in its favor. Ridgewood Bd. of Edu. v. NE for M.E., 172 F.3d 238, 252 (3d Cir. 1999). Finally, in reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party

opposing the motion." <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. <u>LEGAL ANALYSIS - CLAIMS FILED AGAINST DEFENDANT CLEVELAND STEEL</u>

### A. <u>Sexual Discrimination Under Title VII, 42 U.S.C. § 2000</u>

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Title VII, 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by proving that sexual harassment created a "hostile work environment." <u>Huston v. Proctor & Gamble</u>, 568 F.3d 100 (3d Cir. 2009) (citing <u>Kunin v. Sears Roebuck & Co.</u>, 175 F.3d 289, 293 (3d Cir.1999)). In order to establish the existence of a hostile work environment, plaintiff must prove the following: (1) plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive;[3] (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) the existence of respondeat superior liability. <u>Huston</u>, 568 F.3d. at 104. We will review each element separately, along with the facts of record, viewing these facts in the light most favorable to Rorrer.

### (1) <u>Intentional Discrimination Because of Sex</u>

---

[3] In <u>Jenson v. Potter</u>, 435 F.3d 444, 449 n. 3 (3d Cir. 2006), the court noted that while the Third Circuit had often stated the discrimination must be "pervasive and regular," the Supreme Court employs a "severe or pervasive" standard. "The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here." <u>Id.</u>

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.' " Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 80. Sexual harassment need not be motivated by sexual desire or "include sexual overtones in every instance." Id. at 80; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990). The court is required to undertake "a more fact intensive analysis . . . where the actions are not sexual by their very nature." Id. at 1482 n. 3.

Defendant Cleveland Steel argues that there is no evidence that Gilbert's touching of Rorrer's breast on August 1, 2006 was an act of intentional discrimination because of Rorrer's sex. According to Cleveland Steel, after Gilbert opened the box, using the utility knife, he was ready to resume working but could not get Rorrer's attention, presumably because of the noise. Cleveland Steel claims that as Gilbert reached towards Rorrer with the closed utility knife in his hand, Rorrer turned towards him and the knife made contact with her breast. Defendant argues that nothing in this transaction suggests that Gilbert acted as he did because of her gender. (Def. Cleveland Steel's Memo. pp. 5-6.)

Plaintiffs do not respond directly to this element, but generally point out that in order to determine whether a workplace environment is hostile, the court must look at the totality of the circumstances. (Pls.' Memo. p. 2, citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)).

We note that Rorrer's version of the events is much different than Cleveland Steel's in that she claims that Gilbert deliberately touched her breast with a utility knife. When this incident is viewed along with Rorrer's claim that Gilbert was constantly staring at her breasts and other

evidence highlighted by Rorrer regarding Gilbert's history of "continuous harassment of his female co-workers," his conduct towards her could be viewed by a fact finder as gender motivated. <u>See Seybert v. International Group, Inc.</u>, 2009 WL 722291 (E.D.Pa March 18, 2009) (plaintiff presented sufficient evidence to support the allegation that the harassment was because of gender where plaintiff alleged three incidents that contained overt sexual overtones - two where he stared at her breasts and one where he directed a sexual comment at her - along with incidents that were, on their face, non-discriminatory but still contributed to an overall sexually hostile environment).

(2) <u>Severe or Pervasive</u>

Plaintiffs must also point to evidence that the harassment was severe, or pervasive and regular discrimination. To prove this element, plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris</u>, 510 U.S. at 21 (citations omitted). "The disjunctive phrasing means that 'severity' and 'pervasiveness' are alterative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the work place only if it is pervasive." <u>Jenson v. Potter</u>, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (citing Sullivan, *Employment Discrimination*). Therefore, a single incident of severe harassment in the workplace may contaminate the work place to such a high degree that it will be considered hostile. <u>Id</u>. Where harassment is not severe, incidents of harassment must occur either in concert or with regularity. <u>Andrews</u>, 895 F.2d at 1484.

When examining these standards, courts are to "look[] at all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance." Harris, 510 U.S. at 23. "Incidents involving employees other than the plaintiff are also relevant in establishing generally hostile work environment." Velez v. QVC, 227 F.Supp.2d 384, 410 (E.D. Pa. 2002). However, incidents reported by other female employees do not bear on plaintiff's individual claim of sexual harassment in the absence of evidence that plaintiff was aware of the incidents and that such incidents affected plaintiff's psychological well-being. Id.

Defendant Cleveland Steel asserts that Plaintiffs cannot establish that the August 1, 2006 incident was severe or that Rorrer suffered pervasive and regular discrimination. Specifically, they argue that one touch using a utility knife without a protruding blade is not "severe." Additionally, Cleveland Steel claims that Plaintiffs cannot establish pervasiveness, which entails regularity of harassment. Cleveland Steel points out that the only non-hearsay evidence of incidents involving other female employees is that of Barbara Yeakel, who alleges that Gilbert put a screwdriver to her breasts two years prior to Rorrer's August 1, 2006 incident. (Def. Cleveland Steel's Memo. p. 6; Def. Cleveland Steel's Reply Memo. pp. 5-6.)

According to Plaintiffs, a fact finder could certainly find that an assault with a knife was "severe." Plaintiffs refer to facts of record that establish that when Rorrer's face was turned away from Gilbert, she felt pressure against her left breast. When she turned around, she observed that Gilbert was pressing a utility knife into her breast. Plaintiffs also note that Dan Dulin, a Cleveland Steel Vice President and Gilbert's cousin, can establish that Gilbert admitted to him that when he did this, the blade to the utility knife was protruding. Rorrer has testified that Gilbert stood looking at her with a crazed look like he was going to kill her. In short, Plaintiffs argue this was a physical attack that threatened Plaintiff's life and was thus, "severe." (Pls.' Memo. pp. 3-6.)

Plaintiffs further point out that this incident was part of a pattern of harassment directed toward Rorrer and her female co-workers. In addition to the August 1, 2006 attack, Rorrer notes that Gilbert had on one occasion pointed at her breasts like he was going to grab them and on another occasion told her to bend over in a suggestive manner. She notes that "[h]e just looked down my shirt and kept staring at my breasts all the time. There's not one occasion; there's (sic) all the time he's around." (Pls.' Memo. p. 6.)

Plaintiffs also cite to an incident where Gilbert pushed an electric screwdriver, which was receiving power, into co-worker Yeakel's shirt between her breasts. Additionally, Yeakel testified that Gilbert stared at other female employees' breasts. Rorrer notes that she was aware that other employees had been harassed by Gilbert and that Yeakel had complained about Gilbert's behavior. (Pls.' Memo. pp. 6-7.)

Viewing all of this evidence in a light most favorable to Plaintiffs, and considering the frequency and severity of the conduct and the fact that if believed, Rorrer's version of the August 1, 2006 incident could certainly be viewed as physically threatening, we find that a fact finder could determine that the harassment was severe or pervasive. As noted by the Tenth Circuit in O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999), the severity and pervasiveness evaluation is particularly unsuited for summary judgement because it is "quintessentially a question of fact."[4]

---

[4]Defendant is correct that one of the elements we must look to in determining "pervasiveness" is the frequency of harassment, and that Plaintiffs are unable to establish with any particularity, the dates of the two prior alleged incidents involving Rorrer and Gilbert. However, Rorrer testified that Gilbert's staring was "constant."

### (3) Did the Discrimination Detrimentally Affect Plaintiff

Plaintiffs must next demonstrate that Rorrer was detrimentally affected by the harassment. If the "victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." Harris, 510 U.S. at 21-22. While no single factor is required, "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." Id. at 22.

Rorrer has provided sufficient evidence that she both perceived Gilbert's conduct to be abusive and that she was detrimentally affected by it. Rorrer testified at deposition that her fear that Gilbert was going to kill her was so extreme that she had to ask her mother to move into her home; that she has nightmares of Gilbert chasing her; that she wets her bed; has had images of Gilbert in her backyard with a gun; and stays in the house all day with her door locked. (Pls.' Memo. p. 4.) Defendant does not address this element.

### (4) Would the Discrimination Detrimentally Affect a Reasonable Person of the Same Sex, In the Same Position

Plaintiffs must show that a reasonable person of the same sex in the same position would have been detrimentally affected by the harassment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." Harris, 510 U.S. at 21. Whether conduct is objectively hostile or abusive, as opposed to subjectively so, "is the more critical [factor] for it is here that the finder of fact must actually determine whether the work environment is sexually hostile." Andrews v. City of Philadelphia, 895 F.2d 1469, 1483 (3d Cir. 1990). Evidence

that others were harassed may serve to bolster objective reasonableness of a plaintiff's claims. Anderson, 131 F.Supp. 2d at (citing West v. Philadelphia Electric Co., 45 F.3d 744, 757 (3d Cir. 1995)).

Defendant Cleveland Steel argues that the "extreme nature of Rorrer's reaction to a single, non-violent touching with a closed utility knife does not translate into the argument that a reasonable woman in her position would find that this single event rendered her workplace **sexually** hostile." (Def. Cleveland Steel's Reply Memo. p. 6.)

Again, Plaintiffs do not address this factor directly. However, we note that Rorrer has pointed to evidence that could establish that after two separate incidents involving Gilbert, and his constantly staring at her breasts, he held a utility knife with a protruding blade to her breast. Given these facts, a jury should be left to determine whether a reasonable person would have been detrimentally affected by this conduct.

(5) Respondeat Superior

Lastly, in order to survive Cleveland Steel's motion, Plaintiffs must establish the existence of respondeat superior liability. When the "hostile work environment" is allegedly created by a victim's non-supervisory co-worker, as is the case here, employer liability "exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston v. Proctor & Gamble, 568 F.3d 100 (3d Cir. 2009).[5] We address each scenario separately.

---

[5] As noted in Huston, the term respondeat superior in the sexual harassment context "connotes notice to the employer." Id. at 105, n. 3.

An employer may be held liable for the harassment of its employees if it fails to provide a "reasonable available avenue" of complaint. Datis v. Office of Atty Gen. of Pa., 1998 WL 42267, at * 5 (E.D. Pa. Jan 16, 1998) (citing Cross v. State of Alabama, 49 F.3d 1490, 1506-07 (11th Cir. 1995)). In Datis, in order to determine whether the avenue of complaint was reasonable, the court looked to whether such avenue was effective. Id. The Third Circuit has instructed that "an effective grievance procedure [is] one that is known to the victim and timely stops the harassment." Bouton v. BMW of N. America Inc., 29 F.3d 103, 110 (3d Cir. 1994). Such a procedure shields the employer from Title VII liability for hostile environment.

Cleveland Steel contends that it provided a reasonable available avenue for complaint, in that all employees were provided with an employee handbook containing a provision barring all sexual harassment. The handbook advised employees that if they felt they were victims of harassment, they should report the harassment to "his/her immediate supervisor, or the Director of Employee Relations or any other officer, supervisor, or manager who can address the problem." Cleveland Steel also points out that Rorrer acknowledged having received and read the handbook, yet there is no record of Rorrer ever having made a complaint before the August 1, 2006 incident. Cleveland Steel thus concludes that the undisputed facts establish that it provided a reasonable, effective, available avenue of complaint, and because Rorrer never availed herself to this process, there is no liability under this prong. (Def. Cleveland Steel's Memo. p. 9; Cleveland Steel Non-Harassment Policy, pp. 2-3)

In response, Plaintiffs cite to evidence which they allege establishes that although Cleveland did have an avenue or plan to report harassment, that avenue was not effective, and thus, not

reasonable. For instance, Plaintiffs point to the fact that while Cleveland Steel may have adopted a sexual harassment policy, the company failed to educate its employees or managers about how to identify, deal with and report sexual harassment. Plaintiffs thus contend that while employees were given handbooks, they were never trained in sexual harassment rendering any avenue for complaint meaningless.[6] (Pls.' Memo. pp. 15-16.)

Plaintiffs also point to evidence of record which could establish that Cleveland Steel's "available avenue of complaint" was ineffective and not reasonable because the handbook directed employees to report harassment to "any officer, supervisor, or manager who can address the problem," yet it was not clear who those officers, supervisors, or managers were. (Pls.' Memo. pp. 15-16.) For instance, Rorrer and Yeakel testified that they believed that Phyllis Plate and Paul Gerhardt, Cleveland Steel employees to whom they had previously complained to about Gilbert, were supervisors. Neither Plate nor Gerhardt told Rorrer or Yeakel that they were not supervisors nor did they advise that reporting should be done through someone higher in management. Instead, when Rorrer or Yeakel complained about Gilbert's behavior, Plate and Gerhardt responded that they would take care of their complaints or would talk directly with Gilbert. Rorrer stated: " I thought if I reported to my supervisors, they would take care of it, so I kept on reporting my discomfort with Gilbert to my supervisors." While Rorrer thought she was making appropriate complaints, because

---

[6] According to Plaintiffs, Ed Umstead, the Plant Manager, was the only employee Cleveland Steel had documented as having attended training. Several employees claimed to have received training but could not remember the content of the sessions. Others, including Rorrer, Yeakel, Patricia Niles and Ruth Stoudt, all Cleveland Steel employees, indicated they never received sexual harassment training. Another employee, Phyllis Plate, was unaware Cleveland Steel had a non-harassment policy. Further, Rorrer and Yeakel claim that they received handbooks but were never trained on how to report sexual harassment or who to report it to. (Gerhardt Dep. pp. 15-16; Ohl Dep. pp. 8-9; Stoudt Dep. p. 12; Niles Dep. pp. 24-25, Affidavit of Barbra Yeakel; Affidavit of Lucy Rorrer; Plate Dep. p. 10.)

the system was not effective, she asserts that Cleveland Steel never took any official disciplinary action against Gilbert and the harassment never stopped. (Affidavit of Barbara Yeakel, Dec. 29, 2006; Affidavit of Lucy Rorrer, Jan. 1, 2010; Verified Statement of Lucy Rorrer; Yeakel Dep. pp. 117-22, 194-95; Gilbert's Personnel Files, CSCC 19-20.)

When viewed in the light most favorable to Plaintiffs, we conclude that the totality of this evidence reflects that Plaintiffs have presented triable issues of fact as to whether Cleveland Steel provided an effective avenue of complaint.

> [b]  The Employer Knew or Should Have Known of the Harassment and Failed to Take Prompt and Appropriate Remedial Action

Plaintiffs allege that Cleveland Steel knew or should have known of Gilbert's ongoing harassment before the August 1, 2006 utility knife incident and failed to take prompt and appropriate remedial action. They also allege that proper remedial action was not taken after this incident occurred.

An employer "knew or should have known" if "management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment." Employers have constructive notice when "an employee provides management level personnel with enough information to raise the probability of sexual harassment in the mind of a reasonable employer." Huston 568 F.3d at 105 (citing Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999)). An employer may also have constructive notice of harassment that is "so pervasive and open that a reasonable employer would have had to be aware of it." Id. at 105 n. 4 (citing Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018-19 (7th Cir. 1996)).

The Third Circuit recently explained that "management level" in the context of imputing

constructive notice of a co-worker, refers to a specific group of employees. "[A]n employee's knowledge of sexual harassment may be imputed to the employer when the employee is employed to report or respond to sexual harassment." Huston 568 F.3d at 107. There are two circumstances where this occurs. The first is "where the employee is sufficiently senior in the employer's governing hierarchy or otherwise in a position of administrative responsibility over the employee under him, such as a departmental or plant manager . . . . [T]he employee usually has the authority to act on behalf of the employer to stop harassment, for example, by disciplining employees or changing their employment status or work assignments."[7] Id.

Requiring that management have knowledge of the harassment through this level of employee means that the "knowledge [must] have reached an employee in the governing body of the entity, as opposed to merely a supervisory employee in the labor force." Id. at 108. The Huston Court clarified that, "mere supervisory authority over the performance of work assignments by other co-workers is not, by itself, sufficient to establish an employee for management level status. . . . [T]o the extent that a supervisor does not have a mandate generally to regulate the work-place environment, that supervisor does not qualify as management level." Id

In Huston, the plaintiff argued that two technicians with supervisory responsibilities were the equivalent of management level employees and thus their knowledge of potential harassment should have been imputed to their employer. Huston, 568 F.3d at 108. The court rejected this argument, noting that even though the technicians had a supervisory role overseeing the production line, unlike

_____

[7] The second method of constructive notice is "where the employee is specifically employed to deal with sexual harassment. Typically, such an employee will be part of the employer's human resources, personnel or employee relations group or department." Huston, 568 F.3d at 108. This standard is not at issue here.

managers, they had no authority to affect the employment status of their teammates, to police for and stop harassment, or to report any rumors of potential harassment. Id. Based on these findings, the court found that the technician/supervisors were not management level employees for the purpose of imputing to their employer their knowledge of potential co-worker sexual harassment. Id. at 108-09.

With this background in mind, we address the question as to whether sufficient evidence exists that Cleveland Steel knew or should have known that Gilbert was allegedly harassing Rorrer and other female employees before August 1, 2006. Cleveland Steel's argument is straight forward and focuses on the fact that no "management level employment" had notice of prior inappropriate conduct by Gilbert. (Def. Cleveland Steel's Memo. pp. 10-11.) Rorrer's response involves several steps of analysis. First, Rorrer points to the Cleveland Steel employee handbook which instructed that she report harassment to a variety of persons, including her supervisor. Next, relying on the principal of apparent authority, Rorrer contends that she reported Gilbert's ongoing harassment to Cleveland Steel employees, Phyllis Plate and Richard Gerhardt, who she viewed as supervisors who were tasked with receiving harassment complaints. Cleveland Steel responds that Plate and Gerhardt were hourly employees who worked on the production line, were not in management positions, or designated to deal with sexual harassment. Id. While this issue is close, we agree with Plaintiff for the following reasons.

First, Cleveland Steel's sexual harassment policy directs that employees report harassment to supervisors. Cleveland Steel's directive on this issue contained very broad instructions to employees as to who, in the Cleveland Steel hierarchy, should receive harassment complaints. The policy provided varied options that included reporting to "his/her immediate supervisor, or the

Director of Employee Relations or <u>any other officer, supervisor, or manager who can address the</u> <u>problem.</u>" (emphasis added). Rorrer has indicated that beyond this policy, Cleveland Steel provided no other direction as to the identity of the officers, supervisors, or managers who should receive harassment complaints. (Cleveland Steel Non-Harassment Policy, pp. 2-3; Affidavit of Lucy Rorrer, Jan. 1, 2010; Pls.' Memo. pp. 9, 15-16.)

Second, although the record before us is not particularly clear regarding Cleveland Steel's management and supervisory structure, Plaintiff has pointed to evidence which could establish that Gerhardt and Plate had authority beyond that of a typical employee and thus, could have reasonably been viewed by Rorrer as "any other officer" or "supervisor" as specified in Cleveland Steel's harassment policy. Specifically, the record reflects the following: Plate testified that she was the "coordinator" in the spouts department. This position entailed, in addition to working on the line, giving other line workers their assignments. Plate received a higher hourly wage because "there was more responsibility." When asked what Plate did at Cleveland Steel, Yeakel responded that she "was in charge of us to make sure we had our work, that our work got done, and she was giving orders that had to be out." Rorrer also testified that Plate was her "supervisor" and Gilbert indicated he sometimes took direct orders from Plate, who he considered his supervisor. (Plate Dep. pp. 8-19; Yeakel Dep. pp. 112, 185; Gilbert Dep. p. 33, 74; Verified Statement of Lucy Rorrer.)

Gerhardt testified that in addition to being a forklift operator, he has the title of "inspirational leader." Prior to being an inspirational leader he was a "group leader," and was in that position to primarily "hand out work." Yeakel testified that Gerhardt was a supervisor and forklift operator, and

Rorrer indicated that she reported a prior incident with Gilbert "to [her] supervisor, Paul Gerhardt."[8] (Gerhardt Dep. pp. 6-11, 31; Yeakel Dep. pp. 44, 194; Verified Statement of Lucy Rorrer.)

Finally, Plaintiffs stress that while Gerhardt and Plate were not in typical management positions, they did, as evidenced by the facts above, have certain supervisory authority and more importantly, at least for purposes of summary judgment, they were cloaked with sufficient authority to impute knowledge to Cleveland Steel of ongoing harassment. Specifically, Plaintiffs note that Rorrer and co-worker Yeakel, in following the employee handbook, and, having received no direction as to the exact person they should be reporting to on harassment matters, lodged their complaints with Plate and Gerhardt. Importantly, according to Plaintiffs, Plate and Gerhardt did nothing to dispel their belief that they were the appropriate people to complain to about ongoing harassment. Rather, both Plate and Gerhardt told Rorrer and, in other instances, Yeakel, that they would in fact deal with the situation. According to Plaintiffs, when Rorrer complained to Gerhardt about Gilbert pointing at her breasts, Gerhardt reprimanded him. When Gilbert put a screwdriver to Yeakel's breasts she reported the incident to Gerhardt who said he would report it to the Plant Manager, Ed Umstead. Plate also assured Yeakel that she would "look into it" when Yeakel told her that Gilbert was constantly staring at women's breasts. Plaintiffs also note Yeakel's testimony that she and "almost everybody" complained about Gilbert's harassment to Plate. In sum, Plaintiffs assert that these facts are sufficient to submit the issue of apparent authority to a jury. (Pls. Memo. pp. 9-13; Rorrer Dep. pp. 280-84; Yeakel Dep. pp. 117-21.)

Apparent authority exists where a principal, by words or conduct, leads people with whom

---

[8] We note that Gerhardt indicated that there were no supervisors or foremen in the shipping department where he worked.

the alleged agent deals to believe that the principal has granted the agent the authority he or she purports to exercise. Atchinson v. Sears, 666 F.Supp.2d 477, 497 (E.D. Pa. 2009). Apparent authority may bind a company for the purposes of Title VII, "[i]f a harassment victim reasonably believes that an official has a duty to stop or report the harassment." Anderson v. Deluxe Homes of Pa. Inc., 131 F. Supp.2d 637, 652 (M.D. Pa 2001) (citing Torres v. Pisano, 116 F.3d 625, 636 (2d Cir. 1997)). We also note that under the law of Pennsylvania, the scope of the authority or employment of an agent or servant "is a factual issue for the jury." Anderson, 131 at 642; Norton v. Railway Express Agency, Inc., 412 F.2d 112, 114 (3d. Cir. 1969).

We conclude that a factual issue exists as to whether Cleveland Steel, through its words and/or conduct, led Rorrer to believe that Plate and Gerhardt were granted authority to receive, stop and/or report harassment. These actions included the issuance of a very broad policy regarding reporting of harassment, coupled with a lack of direction to employees as to who the specific individuals were that were to receive such complaints. Cleveland Steel's conduct also included the creation of a work atmosphere where persons with certain decision making authority, e.g., Plate and Gerhardt, received Rorrer's complaints, advised that they would take appropriate actions, and did nothing to encourage Rorrer to take her complaints elsewhere. Under these facts, a jury could conclude that Rorrer reasonably believed that Plate and Gerhardt were cloaked with a duty to receive, stop and/or report harassment, even if they were not her direct supervisors or in management positions.

Finally, although Huston did not address the issue of apparent authority, several facts in that case convince us that our analysis on this issue is correct. In Huston, the Plaintiffs conceded that the supervisory employee who she claimed could bind the company, did not have authority to discipline

workers.  Huston, 568 F.3d at 105.  Here, Plaintiff has pointed to evidence which could establish that at least Gerhardt reprimanded Gilbert.  Further, in Huston the court found that Plaintiff clearly understood the companies hierarchy and the differing duties of employees and managers.  Id. at 109.  Here, the facts relied upon by Rorrer paint a much different picture.

Having found that Plaintiffs have presented enough facts to show that Cleveland Steel knew or should have known of the pre-August 1, 2006 harassment, we now address whether Plaintiffs have set forth sufficient facts as to whether Cleveland Steel took prompt and appropriate remedial action.  In most cases, the focus on this issue will be on the timing and nature of the employer's response.  A remedial measure is considered adequate if "reasonably calculated" to end the harassment and prevent further misconduct.  Knabe v. The Boury Corp., 114 F.3d 407, 412-13 (3d Cir. 1997).  An employer cannot be liable under Title VII if its remedial action stopped the harassment.  Id.  However, Title VII liability may arise "where an employer merely investigates the complaint without taking any remedial action, or the investigation is so flawed that any remedial measures are destined to fail."  Hall v. Pa. Dept. of Corr., 2006 WL 2772551, *12 (M.D. Pa 2006).

According to Gilbert's own personnel file, there was never an investigation nor was Gilbert ever reprimanded for alleged sexual harassment prior to August 2006.  Plaintiffs contend that because the facts of record reflect that no remedial action was taken, a jury should decide this issue.  (Pls.' Memo. pp. 18-19.)

We agree.  If a jury were to determine that Cleveland Steel was bound by apparent authority, and, therefore, had notice of the incidents reported to Plate and Gerhardt, it could find that Cleveland Steel failed to take prompt and appropriate remedial action in response to Gilbert's alleged inappropriate conduct prior to August 1, 2006.

Regarding the August 1, 2006 utility knife incident, Cleveland Steel admits to having been aware of the occurrence. Thus, the question becomes whether Defendant failed to take prompt and appropriate remedial action regarding this incident. As noted above, a remedial measure is considered adequate if "reasonably calculated" to end the harassment and prevent further misconduct. Knabe, 114 F.3d at 412-13.

According to Cleveland Steel, Rorrer reported the August 1, 2006 incident to Plate almost immediately after it happened. Rorrer and Plate both reported the incident to Richard Mayo, the Production Control Manager who was performing some of the jobs of the Plant Manager, Ed Umstead, while Umstead was away on vacation. Mayo then reprimanded Gilbert and the two employees were separated for the remainder of the August 1, 2006 shift. Rorrer did not work on August 2, 2006 and the two were again separated on August 3, 2006. Further, according to Cleveland Steel, Umstead met with Gilbert about the incident on the morning of August 7, 2006, where he was reprimanded and given three days unpaid suspension. Later that day, Umstead held a meeting with the spouts department, where Rorrer and Gilbert had been working, to inform the employees that inappropriate behavior would not be tolerated. Cleveland Steel asserts that these facts are sufficient, as a matter of law, to establish that adequate remedial action was taken. (Def. Cleveland Steel's Memo. pp. 13-14.)

According to Plaintiffs, Cleveland Steel failed to take prompt remedial measures because on August 1 and 3, 2006, despite Gilbert having placed a utility knife on Rorrer's breast and despite her asking that Gilbert be kept away from her, he was assigned to work near her. Plaintiffs also point out that Mayo, not understanding that Gilbert had traumatized Rorrer, instructed Gilbert to approach Rorrer to apologize. Seeing Gilbert approaching her caused Rorrer to scream and run away as she

believed he wanted to kill her.   (Pls.' Memo. pp.17-18, 21.)

Further, Plaintiffs allege that when Umstead returned from vacation on August 7, 2006, he barely investigated Rorrer's complaint.   Umstead spoke with Gilbert, Richard Mayo and Ruth Stoudt, an administrative assistant, about the incident, but never spoke with Rorrer.   Nor did Umstead have the Human Resources Manager help him with an investigation.   He classified the incident as "horseplay."   After suspending Gilbert for three days, Umstead held a meeting with the spouts department that lasted less than five minutes, wherein he told the employees in attendance, including Rorrer and Yeakel, that Gilbert deserved a second chance.   When, after the meeting, Rorrer and Yeakel attempted to remind Umstead that this was not the first instance of Gilbert having an issue with a woman, Umstead told them "I say this is over."   (Pls.' Memo. p. 19.)   Plaintiffs cite to Fuller v. City of Oakland, 47 F.3d 1522, 1529 (9th Cir. 1995), in which the Court found that "an employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened.   Denial does not constitute remedy."

Plaintiffs also contend that Gilbert's three day suspension was not a reasonable measure to stop or correct Gilbert's behavior.    Plaintiffs assert that the presence of an attacker "who has engaged in particularly severe" conduct can render the workplace hostile.   Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998).   Plaintiffs stress that because the mere presence of Gilbert rendered the work environment "hostile" to Rorrer, the only reasonable remedy would have been for Cleveland Steel to have fired Gilbert.   (Pls.' Memo. p. 20.)

Viewing these facts in a light favorable to Plaintiffs, we find that sufficient questions have been raised about the appropriateness of Gilbert being allowed to work in close proximity to Rorrer after the incident and the sufficiency of Cleveland Steel's investigation.   Therefore, whether the

response of Cleveland Steel to the August 1, 2006 incident was appropriate is a question of fact for the jury.

B. <u>Intentional Infliction of Emotional Distress</u>

In order to recover for the intentional infliction of emotional distress ("IIED"), a plaintiff must show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." <u>Hoy v. Angelone</u>, 554 Pa. 134, 720 A.2d 745 (1998) (citing <u>Buczek v. First National Bank of Mifflintown</u>, 366 Pa. Super. 551, 558 (1987)).

The Pennsylvania Workers' Compensation Act ("PWCA") provides an exclusive remedy for work related injuries. 77 Pa. Stat. § 481(a). This includes IIED claims. <u>Papa v. Franklin Mint Corp.</u>, 400 Pa. Super. 358, 583 A.2d 862, 826-27 (1990). Therefore, IIED claims are generally preempted by the PWCA.

There is, however, an exception to the general preclusion, known as the personal animus exception, that allows a plaintiff/employee to recover from a defendant/employer for "injuries caused by an act of a third party [including co-workers] intended to injure the employee because of reasons personal to him, and not directed against her as an employee or because of his employment." <u>Faust v. Storm</u>, 2009 WL 2143546, at *7 (E.D. Pa. July 15, 2009) (citing <u>Jackson v. Lehigh Valley Physicians Group</u>, 2009 WL 229756, at *6 (E.D.Pa. Jan. 30, 2009)); 77 Pa. Stat. § 411(1). "To fit within the [personal animus] exception, the third party or fellow employee's act must have been motivated by his animosity against the injured employee. If the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [personal animus] exception." <u>Id</u>. at *8 (quotations and citations omitted). The central issue is "an inquiry into

the state of mind of the tortfeasor." <u>Faust v. Storm</u>, 2009 WL 2143546, *4 (E.D.Pa. 2009).

Plaintiffs argue the actions taken by Gilbert were personal in nature and not part of an employee relationship. Plaintiffs also rely on the fact that Gilbert has told so many different versions of the story, and thus assert his intent was unclear.[9]

We find that Plaintiffs have not presented sufficient evidence that Gilbert's conduct was motivated by "personal animus" towards Rorrer. Indeed, Plaintiffs have presented evidence to show that Gilbert bothered a number of women at Cleveland Steel. "If the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [personal animus] exception." <u>Faust</u>, 2009 WL 2143546, at *7. Plaintiffs have the burden of presenting evidence from which a jury could find in its favor. Acknowledging that Gilbert's intent is "unclear" does not meet that burden. Therefore, the IIED claim is precluded by PWCA.[10]

C. <u>Negligent Employment</u>

As noted above, generally, torts against an employer arising out of an employment based injury are preempted by the Worker's Compensation Act. <u>Matczak v. Frankford Candy</u>, (3d Cir 1997). However, "[w]hile it is generally true that negligence actions by employees against their employers are precluded, there is an important exception to the exclusivity provision. An employee

---

[9] For instance, Gilbert has stated that his actions were not an accident; that he accidentally swiped Rorrer in follow through motion while trying to open the box; that he was trying to get her attention; that he was joking around; that he touched her with the butt end; and, that the knife was ten inches away. (Gilbert Dep. pp. 8, 54, 56, 58; Dulin Dep. pp. 26-28; Notes of Ed Umstead, re discussion with Gilbert, Aug. 7, 2006.)

[10] We also note that Plaintiffs' Second Amended Complaint specifically alleges that "[b]y the actions of its employees and management and Richard Gilbert *acting within the scope of his employment* . . . Defendants intentionally, negligently and tortiously inflicted emotional distress of the plaintiff." (Second Amended Compl. ¶ 45) (emphasis added.)

can sue his employer in negligence if the employer's negligence enabled a co-worker to intentionally injure the employee for purely personal reasons." Sabo v. Lifequest, Inc., 1996 WL 182812, *2 (E.D.Pa. 1996).

As noted above, because Plaintiffs have not provided any evidence that Gilbert intentionally injured Rorrer for "purely personal reasons," the incident does not fall within the personal animus exception and is barred by the PWCA.

### D. Loss of Consortium

An action for loss of consortium is a derivative under Pennsylvania law. Scattaregia v. Wu, 343 Pa. Super. 452, 455, 495 A.2d 552, 553 (1985). If Rorrer's claims fail as a matter of law, the Defendant is entitled to summary judgement on this claim. Because issues of fact remain as to some of Rorrer's claims, the loss of consortium claim will survive summary judgement.[11]

## IV. LEGAL ANALYSIS - CLAIMS FILED AGAINST DEFENDANT RICHARD GILBERT

### A. Sexual discrimination under the Pennsylvania Human Relations Act

The "aiding and abetting" provision of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq., makes it unlawful for employees to "aid, abet, incite, compel, or coerce the doing of any act declared by this section to be unlawful." 43 P.S. § 955(e). This provision has been interpreted to apply only to the actions of supervisory employees. Dici v. Commw. of Pa., 91 F.3d

---

[11] Plaintiffs have previously withdrawn their ERISA claim in "Plaintiffs' Motion to Amend Complaint" (doc. no. 87). The Court granted that request (doc. no. 98) and the ERISA claim was not included in the Second Amended Complaint (doc. no. 105). Defendant nonetheless argues that "[r]egardless of [Plaintiffs'] request, Cleveland Steel is entitled to summary judgement because they lack any factual foundation." (Def.'s Memo.) Because the claim has been withdrawn, we will not further address its merits.

542. 552 (3d. Cir. 1996).

Defendant Gilbert contends that Plaintiffs have failed to state a claim under the aiding and abetting provision of the PHRA because Gilbert is a non-supervisory employee. Plaintiffs have conceded that this claim fails.

B. Violation of the Pennsylvania Constitution Article I § 28 and In Violation of the Public Policy of the Commonwealth of Pennsylvania

Plaintiffs also allege a violation of the Equal Rights Amendment contained in Article I § 28 of the Pennsylvania Constitution. Although it is included in the Second Amended Complaint (doc. no. 105), this claim was dismissed by the Honorable Legrome D. Davis on July 15, 2008 (doc. no. 17).

C. Intentional Infliction of Emotional Distress

In order to recover for the intentional infliction of emotional distress ("IIED"), the court must find the defendant's conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy v. Angelone, 554 Pa 134, 720 A.2d 745 (1998) (citing Buczek v. First National Bank of Mifflintown, 366 Pa. Super. 551, 558 (1987). According to the Supreme Court of Pennsylvania, "[i]t has not been enough [to maintain an IIED claim] that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Hoy, 554 Pa. at 152 (citing Restatement (Second) of Torts § 46, comment d).

According to the Third Circuit: "[A]s a general rule, sexual harassment alone does not rise

to the level of outrageousness necessary to make out a cause of action for the intentional infliction of emotional distress. As noted in Cox [v, Keystone Carbon, 862 F.2d 390, 395-96 (3rd Cir. 1988)], 'the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee.' The extra factor that is generally required is retaliation for turning down sexual propositions." Andrews, 895 F.2d at 1487 (internal citations omitted). While retaliation is an important element, the Pennsylvania Supreme Court has stated that consideration of retaliation in the context of an IIED claim "is one of a number of factors to be used in assessing such a claim. By regarding retaliation as a weighty factor, but not a mandated factor, we allow for the rare case in which a victim of sexual harassment is subjected to blatantly abhorrent conduct, but in which no retaliatory action is taken." Hoy, 554 Pa. at 153.

Gilbert first argues that Pennsylvania courts generally do not recognize claims for IIED in the employment context unless there has been both sexual harassment and other retaliatory behavior. See Cox, 862 F.2d at 395-96. He also argues that his actions fall short of the high "outrageousness" bar set by Pennsylvania courts. Gilbert points out that he touched Rorrer with the end of a utility knife in order to get her attention as she was not looking in his direction and was wearing ear plugs. (Def. Gilbert's Memo. pp. 5-6.)

Plaintiffs contend that Gilbert "pressed a utility knife into [Rorrer's] breast and literally scared the wits out of her." This constituted a threat of violence, which is outrageous behavior. Further, after the incident, Rorrer continued to see Gilbert at work and would be terrified, running away if he approached her. Plaintiffs also argue that Gilbert has provided several different versions of the August 1, 2006 incident and thus, the inconsistencies in Gilbert's story leave his intent at issue

for the trier of fact.  See supra, p. 22, n. 9.  Lastly, Plaintiffs argue that "contrary to the defendant's assertion . . . the truth is that there are many cases in which courts have allowed IIED claims to go forward in employment situations and often in cases less egregious than this one."  (Pls.' Memo. p. 11-12;  See EEOC v. Federal Express Corp., 537 F.Supp.2d 700, 713-14 (M.D. Pa 2005); Wils v. Phillips, 1999 WL 200674, *5-6 (E.D. Pa. Apr. 8, 1999); Fawcett v. IDS Fin. Servs., 1986 WL 9877 (W.D. Pa. Jan. 7, 1987); Bowersox v. P.H. Glatfelter Co., 677 F.Supp. 307, 311 (M.D. Pa. 1988).

We note that nearly all of the cases cited by Plaintiffs involve harassment followed by retaliation.  In the one case that did not involve retaliation, Brooks v. Mendoza, 2002 WL 467157, *1 (E.D. Pa. Mar. 25, 2002), Plaintiff, a hostess at Denny's, alleged that the General Manager chased her around the restaurant with a vibrator near his genitalia, making noises, singing, and telling her she could not check out.  While there was not an allegation of retaliation, the defendant's conduct was incessant.  These facts are distinguishable from the facts before us where, even in the light most favorable to Plaintiffs, Gilbert pushed a utility knife into Rorrer's breast, they both froze, and then Rorrer ran away.  We, therefore, find that Plaintiffs have not provided sufficient facts to support a claim for intentional infliction of emotional distress.

D.  Negligent Infliction of Emotional Distress

Plaintiffs allege that they have also raised a claim in Count IV of the Second Amended Complaint of negligent infliction of emotional distress against Gilbert, which Defendant Gilbert did not move to dismiss.  (Pls.' Memo. p. 7 n. 3.)  Count IV of Plaintiff's Second Amended Complaint alleges "Intentional Infliction of Emotional Distress Against All Defendants."   The body of that section includes the wording "Defendants intentionally, negligently and tortiously inflicted emotional

distress of the plaintiff."   We find that this language does not make out a separate claim for negligent infliction of emotional distress against Gilbert.  Further, it would be unfair to Gilbert to allow that claim to go forward because it was not properly listed as a separate cause of action.

E.  Loss of Consortium

Because loss of consortium is a derivative under Pennsylvania law, and all of the claims against Gilbert have been dismissed, this claim is also dismissed.

**V.  CONCLUSION**

For the foregoing reasons, Defendant Cleveland Steel's Motion for Summary Judgment is **GRANTED IN PART**, and **DENIED IN PART**, as detailed above,  and Defendant Richard Gilbert's Motion for Summary Judgment is **GRANTED.**  Our Order follows.