## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LUCY RORRER** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 08-671** |
| | : | |
| | : | |
| **CLEVELAND STEEL CONTAINER CORP.,** | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                        **January 18, 2012**

## MEMORANDUM OPINION

This case involves Title VII claims premised upon an alleged hostile work environment at Cleveland Steel Container Corp., a Quakertown, Pennsylvania company which manufactures steel pails. Before the Court is Plaintiff's motion for a new trial, which raises eighty-six claims of error that allegedly occurred during an eight-day trial. For the reasons set forth below, we find no grounds to disturb the jury's verdict and thus Plaintiff's motion will be denied.

## I.  INTRODUCTION

In the typical case, our approach in addressing post-verdict motions would be to carefully consider the claims presented in conjunction with the trial record, consider the responses, review the law and make a determination regarding those claims. This, however, is not a typical case.

From the outset of discovery, continuing through trial, and now at the post-verdict motion stage, the level of animosity between the lawyers has been beyond anything this Court has witnessed either as a practitioner or judge. This case necessitated unending intervention by the Court and

1

constant resolution of disagreements between counsel on even the most basic matters, such as the exchange of exhibits.  The majority of the issues raised by counsel did not involve principled legal or evidentiary disputes.  Rather, the Court's primary role in this case was to act as a referee between two attorneys whose dislike for each other seemed at times to overshadow the interests of their clients.

The Court is now confronted with reviewing over eighty claims of error raised by Plaintiff (fifty-six actual numbered claims, many with multiple sub-parts).  Addressing these claims has required an enormous amount of time and judicial resources and, frankly, has been disheartening.  Regarding the inordinate number of claims raised by Plaintiff, the comments of the Honorable Ruggero John Aldisert aptly apply here:

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors.  I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is not merit to *any* of them.  I do not say that it is an irrebuttable presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy.  Appellate advocacy is measured by effectiveness, not loquaciousness.

Ruggero J. Aldisert, *The Appellate Bar: Professional Responsibility and Professional Competence — A View From the Jaundiced Eye of One Appellate Judge*, 11 Cap. U. L. Rev. 445, 458 (1982).

Not surprisingly, a majority of the issues raised by Plaintiff's counsel have little to do with substantive allegations of error, but are personal and disparaging attacks on Defense counsel and the Court.  For instance, Plaintiff's counsel alleges that some of Defense counsel's trial strategy included tactics that were aimed to "terrify" Plaintiff, and induce "severe emotional distress."  (Pl.'s Mot. ¶ 4.)  Without any basis or citation to the record, Plaintiff's counsel also accuses Defense counsel of: threatening the Court with reversal if a verdict were allowed for Plaintiff (id. ¶ 28); "misbehaving

in the courtroom, making comments about plaintiff's counsel under her breath, shaking her head and sighing throughout the trial" (id. ¶ 29); and, asking Plaintiff's counsel if she was going to "slither away" (id. ¶ 29).  Without any support or basis, Plaintiff's counsel also alleges that Defense counsel engaged in "unethical conduct in using ex-parte conversations . . . and influencing witness employees not to talk to plaintiff's counsel." (Id. ¶ 33.)  Unfortunately, these very serious allegations are only a small sampling of Plaintiff's counsel's claims.

Plaintiff's counsel's accusations against the Court are equally as scathing.  Essentially, Plaintiff's counsel has alleged that the Court abandoned its most basic and important function—to provide a fair and impartial forum for the parties.  (See id. ¶¶ 27, 33).  Despite this inflammatory rhetoric, our view is that we bent over backwards to provide Plaintiff and her attorney with a fair and dignified forum to present their case.  More importantly, we took great care to resolve all of the unending disagreements between counsel outside the presence of the jury, and the record squarely bears this out.

The simple truth is that if constant intervention was required by the Court, it was due in large part to Plaintiff's counsel's inability to follow even the most basic principles of acceptable advocacy, and this Court's Orders.  Any impatience with Plaintiff's counsel displayed by the Court was more than warranted.  Indeed, we are certain that Defense counsel may be equally as displeased with the Court for the continued latitude and courtesy we tried to extend to Plaintiff's counsel.  If the Court was impatient with Plaintiff's counsel, she only need to examine a few examples of her unprofessional behavior to discern why.  Some of these antics included: instigating a phone discussion with the Court's law clerk regarding her personal and professional difficulties, in which she cried when explaining her reasons for opposing a trial continuance; having her expert meet with

3

Plaintiff for an extensive follow-up exam days before trial and well after the close of discovery, and then failing to advise either Defense counsel or the Court that this had occurred, resulting in sanctions more fully discussed in our Memorandum Opinion of September 20, 2010 (Doc. No. 236); and ending the trial by referring in her closing to the Cleveland Steel employee who allegedly harassed her client as "the Son of Sam," a known serial killer.[1]   (N.T. June 23, 2010, p. 147.)

## II.   FACTS OF THE CASE

While this case was unnecessarily combative and overcomplicated by the lawyers, the facts are relatively simple and straightforward.   Plaintiff, Lucy Rorer, was an employee of Defendant, Cleveland Steel Container Corp., a steel pail manufacturing company.   Although Plaintiff was employed at Cleveland Steel starting in 2000, the unrefuted evidence established that her work schedule was not steady and included extended layoffs.   Indeed, Plaintiff was referred to as a part-time employee, and, as characterized by her counsel, "she was subject to lay-offs, . . . .   Sometimes it would be a week here.   Sometimes it would be a month here.   Sometimes it would be two months. Sometimes it would be more, and it was scattered through the years."   (N.T. June 14, 2010, p. 23.) Plaintiff was laid off from August 2005 until April 2006, a fact which is particularly relevant to one of the central issues before the Court.   (Def.'s Trial Exs. 111, 112.)

The crux of Plaintiff's claims pertain to an incident occurring on August 1, 2006.   On that date, Plaintiff was working alongside a conveyor belt with her coworker, Richard Gilbert, who she claimed had previously harassed female employees.   Plaintiff was running what is referred to as a double fitting machine while Gilbert fed pieces of steel into the machine.   Both employees had

---

[1] Plaintiff's counsel also extended an invitation to the Court's deputy clerk to join her for a drink on the same day as jury selection.   When confronted by this, Plaintiff's counsel characterized this offer as "not exactly true" and "a joke."   (N.T. June 18, 2010, pp. 224-25.)

stopped working so that Gilbert could use a box cutter to open a new box of materials.  Plaintiff claimed that after opening the box, Gilbert reached towards her with the box cutter, pressed it into her left breast and looked like he was "going to kill her."  (N.T. June 15, 2010, pp. 33-34.)

Plaintiff's expert witness, Dr. Robert Toborowsky, testified that, as a consequence of this incident, Plaintiff suffers from chronic post-traumatic stress disorder, which has resulted in her total impairment, both socially and occupationally.  (N.T. June 17, 2010, pp. 70-76.)  Defendant's expert, Dr. Annie Steinberg, disputed this diagnosis and opined that Plaintiff did not meet the diagnostic criteria for post-traumatic stress disorder, and that her symptoms better matched other disorders not related to the August 1, 2006 incident.  Defendant's expert explained that Plaintiff was more likely suffering from anxiolytic-induced disorder, which she described as symptoms and behaviors induced by overmedication.  Defendant's expert also testified that there was the possibility of malingering, or exaggerating, on Plaintiff's part for personal financial gain.  (See N.T. June 22, 2010, pp. 84-85.)

## III.  RELEVANT PROCEDURAL AND FACTUAL HISTORY

Discovery and pretrial motion practice in this case were overly contentious. During the discovery period alone, the parties filed seven motions to compel discovery (Doc. Nos. 26, 50, 54, 56, 57, 79, 80) as well as a motion for sanctions and a motion for a protective order (Doc. Nos. 44, 49).  The Court held a hearing to address many of the outstanding motions on April 3, 2009 and then engaged in subsequent telephone conferences to deal with additional motions.  Pretrial, fifteen motions in limine and motions to exclude were filed.  (See Order, May 19, 2010, Doc. No. 181.)

While settlement negotiations are normally not relevant in addressing post-verdict motions, because Plaintiff's motion for a new trial has raised this issue in a variety of contexts, we also take time to explain that process.

5

The Honorable L. Felipe Restrepo held the first settlement conference in this matter on January 30, 2009.  The parties reconvened before Judge Restrepo on February 9, 2009.  At that point Plaintiff had an opportunity to receive a total of $325,000 in settlement proceeds:  $200,000 offered by Defendant for the Title VII claims and $125,000 she received from Liberty Mutual for a workers' compensation claim.  Plaintiffs' demand before Judge Restrepo was $1 million.  A third settlement conference was scheduled by Judge Restrepo for November 6, 2009 and the Court suspended the Third Amended Scheduling Order to facilitate this process (Doc. No. 86).  However, no settlement was reached.  During trial, Defense counsel indicated that Cleveland Steel had recently offered $150,000 to settle the Title VII claims, and that the offer was still on the table.  (N.T. June 17, 2010, p. 5.)

Trial finally commenced on June 11, 2010 on claims of severe and pervasive sexual harassment discrimination.[2]  After the completion of Plaintiff's case in chief, Defendant raised a Rule 50(a)(i) motion, arguing "that a reasonable jury would not have a legally sufficient evidentiary basis" to find for Plaintiff.  (Doc. No. 197.)  This motion was granted in part, dismissing Plaintiff's claim of pervasive harassment.  A detailed explanation of our reasoning in dismissing this claim is set out in the record.  (N.T. June 23, 2010, vol. 1, pp. 3-13.)  In short, Defendant's motion was granted as to the claim of pervasive harassment because Plaintiff had been laid off for an extended period of time during the alleged period of harassment, thus, greatly dissipating the effects of any harassment prior

---

[2]  We note that Plaintiff's claim of hostile work environment based on her allegations of both severe and pervasive sexual harassment barely survived summary judgment.   Defendant's motion was denied as there appeared to be factual disputes regarding, for example, whether the box cutter blade was out (opened); whether Gilbert's action was intentional or accidental; and whether there was supervisor notice of the alleged harassment.

to the layoff.  See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715-16 (3d Cir. 1997), cert.

denied, 522 U.S. 1128 (1998) (finding that 8-month break in employment "provided an opportunity

for the lingering effects of the prior incidents [of harassment] to dissipate").

The issue of whether the August 1, 2006 box cutter incident was "severe" was  submitted to

the jury, which found in favor of Defendant.  Specifically, the jury found that: (1) Gilbert's conduct

towards Plaintiff on August 1, 2006 was intentional and because of her sex; (2) the incident was

unwelcome; and (3) Plaintiff had not proven by a preponderance of the evidence that she believed the

conduct towards her was severe enough to render her work environment hostile or abusive.[3]

---

[3] The jury filled out the verdict form in the following manner:

**PART I:   LIABILITY – AUGUST 1, 2006 (SEVERE)**

1. Do you find that Ms. Rorrer proved by a preponderance of the evidence that Mr. Gilbert's August 1, 2006 conduct towards Ms. Rorrer was intentional and because of her sex?

   YES ___**X**___ NO _____

   **If your answer to the above question is "NO," STOP HERE.  Your deliberations are over.  If your answer is "YES," then go on to Question 2 below.**

2. Do you find that Ms. Rorrer proved by a preponderance of the evidence that Mr. Gilbert's August 1, 2006 conduct towards Ms. Rorrer was unwelcome by Ms. Rorrer?

   YES ___**X**___ NO _____

   **If your answer to the above question is "NO," STOP HERE.  Your deliberations are over.  If your answer is "YES," then go on to Question 3 below.**

3. Do you find that Ms. Rorrer proved by a preponderance of the evidence that she believed that Mr. Gilbert's August 1, 2006 conduct towards Ms. Rorrer, was severe enough to render her work environment hostile or abusive?

   YES _____ NO ___**X**___

**If your answer to the above question is "NO," STOP HERE.  Your deliberations are**

On June 28, 2010, in accordance with our Rule 50 dismissal of the pervasive claim and the jury's verdict, judgment was entered in favor of Defendant.  On July 23, 2010, Plaintiff filed a motion for a new trial, seeking to have the verdict of the jury set aside and a new trial scheduled pursuant to Federal Rule of Civil Procedure 59.

Plaintiff's motion for a new trial failed to include a brief in support of the motion as required by United States District Court of the Eastern District of Pennsylvania Local Rule 7.1(c).  This rule requires that every motion not certified as uncontested be "accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion." Plaintiff's motion also failed to cite to any legal authority or provide any references to the trial record. See Marcavage v. Bd. of Trs., 2002 U.S. Dist. LEXIS 19397, at * 9 n.8 (E.D. Pa. Sept. 30, 2002) ("Under our district's local rules, failure to cite to any applicable law is enough to deny a motion as without merit since zeal and advocacy is never an appropriate substitute for case law and statutory authority in dealings with the Court.").

Plaintiff's failure to comply with Local Rule 7.1(c) could have justified dismissal of her motion without any further consideration.  See e.g., Equip. Fin., LLC v. Hutchison, 2010 U.S. Dist. LEXIS 102402, at *11, *16-17 (E.D. Pa. Sept. 24, 2010) (denying summary judgment and finding "defendants' mere citation of the statute of frauds without any meaningful discussion of its applicability and without citing other authority in support of its argument . . . insufficient under Local Rule 7.1(c)"); Miller v. Cadmus Commc'ns, 2010 U.S. Dist. LEXIS 19283, at *12 (E.D. Pa. Mar. 1, 2010) (motion deemed "unopposed" due to failure to offer meaningful legal discussion); Depace v.

over.  If your answer is "YES," then go on to Question 4 below.

 (Doc. No. 207.)

Jefferson Health Sys., Inc., 2004 U.S. Dist. LEXIS 24905, at *1 n.1 (E.D. Pa. Dec. 7, 2004) (finding that counsel's wholesale extraction of nearly ten pages from plaintiff's amended complaint called to mind the Seventh Circuit's admonition regarding the virtue of clarity in legal briefs: "Judges are not like pigs, hunting for truffles buried in briefs"); Woods v. Cohen, 1999 U.S. Dist. LEXIS 1556, at *7-8, *10 (E.D. Pa. Feb. 1, 1999) (noting that Local Rule 7.1(c) requires that motions be accompanied by a brief containing factual authorities and indicating that parties are expected to cite to specific sections of the record, including the appropriate transcript pages).

Defendant filed a timely response in opposition, requesting that Plaintiff's motion be dismissed due to its numerous procedural deficiencies. Plaintiff responded with a "Motion for Permission to File Reply Brief," which was substantively a request for a briefing schedule.

Despite the procedural deficiencies in Plaintiff's motion for a new trial, the authority noted above—which would have clearly supported dismissal of Plaintiff's motion without consideration of her eighty-plus claims—and Defendant's strenuous urging that Plaintiff's motion be dismissed outright, we declined to do so, opting to consider Plaintiff's claims on the merits.

On December 13, 2010, finding Plaintiff's motion for a new trial too unwieldy to address without record cites, we ordered Plaintiff to supplement her submission with specific cites to the record.[4] Plaintiff responded by submitting an amended motion for a new trial on January 11, 2011, adding citations to some, but not all, of her claims. Additionally, despite all of Plaintiff's procedural missteps leading up to this point, many of the record cites finally provided by Plaintiff did not

---

[4] This Order stated: "[I]t is hereby ORDERED that Plaintiff shall have thirty (30) days to provide the Court with specific citations to the record in support of each factual assertion made in her motion. Plaintiff may not include any new arguments and, aside from the addition of citations, there shall be no additions to the text of the motion." (Doc. No. 245.)

accurately reference or pertain to her claims.  Other cites are nowhere to be found in the record and appear to have been plucked from thin air.

## IV.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 59 permits a court to grant a new trial "on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  New trials may be granted "(1) when the jury's verdict is against the clear weight of the evidence and a new trial must be granted to prevent a miscarriage of justice; (2) when the verdict is internally inconsistent; and (3) when prevailing counsel committed misconduct and there is a "reasonabl[e] probab[ility] that the verdict was influenced by prejudicial statements." Waddington N. Am., Inc. v. Sabert Corp., 2011 WL 3444150, at *4 (D.N.J. Aug. 5, 2011) (internal citations omitted).

The decision to grant or deny a new trial is within the sound discretion of the trial court. Davis v. Mountaire Farms, Inc., 598 F. Supp. 2d 582, 587 (D. Del. 2009) (citing Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980)).  The court's level of discretion varies depending on the type of error alleged.  Reynolds v. Univ. of Pennsylvania, 747 F. Supp. 2d 522, 533 (E.D. Pa. 2010) (citing Klein v. Hollins, 992 F.2d 1285, 1289-90 (3d Cir. 1993)).  Where a new trial is sought on the ground that the jury's verdict was against the weight of the evidence, the court may grant the motion "only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Id. (citing Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991)).  "This high standard provides due respect for the jury's primary function as factfinder." Id.  (citing Otos Tech., Co., Ltd. v. OGK America, Inc., 2007 WL 2374995, at *3 (D.N.J. Aug. 13, 2007)).

Where a party moves for a new trial based on alleged trial error, the court has broader discretion.  Klein v. Hollins, 992 F.2d 1285, 1289-90 (3d Cir. 1993).  In such instances, the court conducts a two-part inquiry: (1) whether an error was in fact committed; and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice." Reynolds, 747 F. Supp. 2d at 522 (citing Farra v. Stanley-Bostitch, Inc., 838 F.Supp. 1021, 1026 (E.D. Pa. 1993)).  In determining prejudice under the second prong, "a new trial must be granted unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights." Id. (quoting Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600-02 (E.D. Pa. 1989), aff'd, 922 F.2d 184 (3d Cir. 1990)).

## V.   ANALYSIS

In an attempt to adequately respond to Plaintiff's claims in an organized, workable fashion, we have grouped them into categories as follows:  (A) The granting of Defendant's Rule 50 motion regarding Plaintiff's pervasive harassment claim; (B) Allegations that the verdict was against the weight of the evidence; (C) Issues related to the admissibility of evidence; (D) Alleged errors in the instructions to the jury; and (E) The Court's alleged bias against Plaintiff's counsel.

### A.   Dismissal of Plaintiff's Pervasive Harassment Claim

Federal Rule of Civil Procedure 50(a) provides that a court may grant a moving party judgment as a matter of law on any issue where the non-moving party has been fully heard and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).   After careful review of the record, we conclude that it was not error to dismiss Plaintiff's pervasiveness claim.

In determining the existence of a hostile work environment, a court must examine the "totality

of the circumstances," rather than assessing each piece of evidence in isolation. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990).   In making this determination, a court may look to: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  Importantly, the United States Court of Appeals for the Third Circuit has held that when a plaintiff has a break in employment for many months, the effects of any alleged harassment prior to the break can "dissipate." Konstantopoulos v. Westvaco Corp., 112 F.3d at 710, 715-16 (3d Cir. 1997).

In Konstantopoulos, the plaintiff alleged that she had suffered sexual harassment from April 1989 to August 1989, left her employment for eight months, and upon returning in April 1990 was subjected to more sexual harassment.  Id. at 712-14.  The court found that the plaintiff could not establish a hostile work environment as the "lingering effects" of the harassment that occurred from April through August 1989 had dissipated by the time she returned to work in April of 1990.  Id. at 716.  The court emphasized that after leaving her employment in 1989, the plaintiff repeatedly stated that she was "ready, willing and able to return to work."  These statements suggested that, in the plaintiff's mind, the effects of the prior incidents had faded before she actually returned to work.  Id. The few incidents that occurred when the plaintiff returned to work, consisting of gestures made by male coworkers' squinting their eyes and shaking their fists at her, were not sufficiently numerous or severe enough to warrant the conclusion that the working environment remained hostile or abusive. Id.

The principles enumerated in Konstantopoulos squarely apply here.  The evidence presented

at trial conclusively established that Plaintiff was laid off for eight months, from August 2005 to April 2006. (Def.'s Trial Exs. 111, 112.) Plaintiff voluntarily returned to work and testified that generally, upon her return from a layoff, Gilbert did not "act differently" than he had previously, and specifically that when she returned from her layoff in April 2006, Gilbert stared at her breasts "all the time." (N.T. June 15, 2010, pp. 151, 170.) Thus, viewing the facts in the light most favorable to Plaintiff, after her eight-month layoff, aside from the August 1, 2006 incident, the only possible evidence of harassment established by Plaintiff was that Gilbert stared at her breasts. This type of conduct is not sufficient to support a claim of severe or pervasive harassment. See Willauer v. Riley Sales, Inc., 2009 WL 2959822, at *5 (E.D. Pa. Sept. 16, 2009) (finding that "[t]he conduct that [p]laintiff alleges is not pervasive. Plaintiff's charges are mostly of isolated incidents. The only conduct that occurred with any frequency—the [breast] staring—was not severe.")

Additionally, like the plaintiff in Konstantopoulos, Plaintiff indicated that she liked working at Cleveland Steel and she thought she would be there until she retired. (N.T. June 15, 2010, p. 137; N.T. June 23, 2010, p. 92.) As her counsel stated in her opening argument: "[S]he would always come back to the same job. And she loved this job. She was good -- she thought -- she had a lot of pride in what she was doing." (N.T. June 15, 2010, p. 30.) Plaintiff's willingness to return to work after her layoff suggests that, in her mind, the effects of the prior incidents had dissipated before she returned to work. See Konstantopoulos, 112 F.3d at 716.[5]

Further, Plaintiff was unable to point to any alleged harassment of other women in the period between her return to work and August 1, 2006. Considering Plaintiff's part-time status and her

_____

[5] We also refer to and incorporate our detailed explanation and ruling on this issue at trial. (N.T. June 23, 2010, vol. 1, pp. 3-13.)

extended layoff, which ended just months prior to August 1, 2006, and after considering the totality of the circumstances, we found the August 1, 2006 incident to be an isolated event that could not, standing alone, be used to support a claim of continuing, pervasive harassment.[6]

On this issue, Plaintiff alleges "substantial prejudicial error" in that the Defendant was allowed to present a "new theory of defense" based on payroll documents that were not produced in discovery.  Without any support, Plaintiff audaciously claims that Defendant purposely concealed records of Plaintiff's purported layoffs and then convinced the Court, ex parte, that there was no dispute as to the timing and length of Plaintiff's layoff.  (Pl.'s Mot. ¶ 5.)

This alleged discovery violation was extensively addressed at the pretrial hearing held on June 14, 2010.  (See N.T. June 14, 2010, pp. 22-47.)  There, Defense counsel indicated she would offer two witnesses to establish the dates of Plaintiff's layoff:  Ed Umstead, the General Manager of Cleveland Steel's Quakertown plant, and Ruth Stoudt, an administrative assistant, who would both testify that Plaintiff was laid off from August 2005 to April 2006.  (Id. at 37-38.)  Plaintiff's counsel fails to mention that Umstead and Stoudt had previously been deposed.  Defense counsel also advised at the pretrial hearing that she would rely on Plaintiff's tax return documents, which were in Plaintiff's possession at the time, to establish lapses in Plaintiff's work schedule.  Further, Defense

---

[6] Plaintiff's pervasive claim survived summary judgment based on her allegations that, in addition to the August 1, 2006 incident and constant breast staring, Gilbert had on one occasion pointed at her breasts like he was going to grab them and on another occasion told her to bend over in a suggestive manner.  Further, Plaintiff claimed that she was aware that other employees had been harassed by Gilbert and complained about his behavior.  (Summ. J. Op. 8.)  We note that no evidence of the eight-month layoff in the record was presented to this Court at the summary judgment stage.  (See Order on Def.'s Mot. for Reconsideration, Doc. No. 185.)  Had the same evidence been presented as was presented at trial, for the same reasons we granted (in part) the motion for judgment as a matter of law, the claim would not have survived summary judgment.

counsel offered that she may rely upon Plaintiff's payroll records to demonstrate Plaintiff's employment dates. Although Plaintiff's payroll records had not been previously produced, they were never requested during the discovery period by Plaintiff. (Id. at 36, 44.) Indeed, Plaintiff never filed a motion to compel those documents or otherwise raised this issue. (Def.'s Resp. ¶ 5.) Nonetheless, out of an abundance of caution, Defense counsel was ordered to send the payroll records to Plaintiff's counsel, which Plaintiff received prior to trial. Plaintiff's counsel was advised that if she wished to reconvene the depositions of Umstead and Stoudt, she could do so. This offer was declined. (N.T. June 14, 2010, pp. 46-47.)

Plaintiff's claim of "prejudicial error" regarding this discovery issue is meritless because Plaintiff and her counsel knew, or could have easily determined, the days Plaintiff worked and when the layoff occurred. Indeed, Plaintiff testified that she could obtain records of her employment using the PIN assigned to her by the PA Unemployment Compensation office. (N.T. June 16, 2010, pp. 156-58.)

Most incredibly, Plaintiff's counsel continues to claim error on this issue despite the fact that Plaintiff confirmed that the information in the payroll records—the focus of this alleged "prejudicial error"—was correct. (Id. at 167-70) (demonstrating Plaintiff agreed that the documents showed that her last day of work in 2005 was August 4 and her first day of work in 2006 was April 3). Indeed, Plaintiff's counsel readily conceded that she was aware of her client's on-again, off-again employment. When asked how Plaintiff legitimately received unemployment compensation if she was in fact employed at Cleveland Steel, Plaintiff's counsel responded:

> Because she was what they call a part-time employee, and she was subject to layoffs, I guess at the company. Sometimes it would be a week here. Sometimes it would be a month here. Sometimes it would be two months. Sometimes it would be more,

and it was scattered through the years.

(N.T. June 14, 2010, p. 23.)  Given the unrefuted evidence that Plaintiff's employment at Cleveland Steel was sporadic, a point both Plaintiff and her counsel conceded, Plaintiff's pervasive harassment claim was properly dismissed pursuant to Konstantopoulos.

### B.   The Jury Verdict Was Not Against the Weight of the Evidence

Plaintiff next argues that the jury's verdict regarding her "severe" discrimination claim was against the weight of the evidence.[7]  A review of the trial record reflects that the jury's verdict in no way "resulted in a miscarriage of justice" or that the verdict "cries out to be overturned or shocks our conscience."  See Reynolds v. Univ. of Pennsylvania, 747 F. Supp. 2d 522, 533 (E.D. Pa. 2010) (citing Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991)).

At trial, Plaintiff testified that she never saw the box cutter when Gilbert pressed it against her, but rather felt pressure on the side of her breast.  She also testified that the box cutter was closed—that is, the blade was inside its case—and that when the incident occurred, Gilbert did not say anything threatening to her except "slow down."  (N.T. June 15, 2010, pp. 181-82; N.T. June 16, 2010, pp. 99-106.)  There was also no evidence that Plaintiff was physically injured by the incident.

Courts have found that far more extreme incidents do not rise to the level of the severity required for a hostile work environment.  See e.g., Carattini v. Woods Servs., Inc., 2010 WL 447453,

---

[7] Specifically, Plaintiff states that:  (1) there is "no evidence that Ms. Rorrer was not detrimentally affected by the pushing of a box cutter into her breast," as there was copious testimony that Plaintiff was so upset and frightened that she could not return to work, and thus, it was an error to even submit the issue to the jury; (2) the verdict is contrary to the law as there was "no evidence to support the verdict that plaintiff was not severely sexually harassed in such a way as to alter the conditions of her employment;" and (3) the jury's verdict that the incident was not severe enough to affect the conditions of Plaintiff's employment is against the weight of the evidence.  (Pl.'s Mot. ¶¶ 1-3.)

at *1, *3 (E.D. Pa. Feb. 4, 2010) (finding incident in which plaintiff claimed her coworker "grabbed her breasts and vagina while both were working in a laundry room . . . that she screamed and exited the laundry room . . . but that [her coworker] followed her and continued to harass her" did not rise to the level of severity required for hostile work environment); Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001) (granting summary judgment for defendant on hostile work environment claim where plaintiff asserted that her supervisor: (1) touched her breast, told her that she looked "fresh" and propositioned her to join him later that evening; (2) made several suggestive comments about plaintiff's eyes and offered his financial assistance if plaintiff would go out with him; (3) removed a bottle of wine from his pants, offered plaintiff a drink and asked her to join him at a hotel where they could have a "good time;" and (4) patted plaintiff on the breast and buttocks after complimenting her on good work); McGraw v. Wyeth-Ayerst Labs., 1997 WL 799437, at *1-2 (E.D. Pa. Dec. 30, 1997) (finding supervisor's repeated requests for a date, kissing plaintiff without her consent, "forcing his tongue into her mouth," touching plaintiff's face, and yelling at her on one occasion not severe enough to create a hostile work environment).

In addition, the jury considered the evidence in conjunction with the testimony of Defendant's expert, Dr. Annie Steinberg, a psychiatrist, who opined that Plaintiff's emotional and mental problems were more likely a result of her addiction to a powerful combination of psychotropic medications than the box cutter incident. (N.T. June 22, 2010, pp. 84-104.) Based upon the evidence at trial, a reasonable jury could find that Plaintiff, while clearly upset, did not find Gilbert's conduct towards her to be severe enough to render her work environment hostile or abusive.[8]

_____

[8] Plaintiff's claim of severe harassment survived the motion for summary judgment largely based on her allegation, viewed in a light most favorable to her, that there was evidence that the blade to the box cutter was protruding, supporting her argument that the incident was a

**C.  Allegations Regarding the Admissibility of Evidence**

> 1.  Evidence of Vague, Undated Allegations of Sexual Harassment Were Properly Excluded

Plaintiff raises a number of allegations regarding the preclusion of alleged incidents of harassment at Cleveland Steel where the time frame of the incidents was unknown or, where the incidents occurred prior to Plaintiff's employment.  Without any cites to the record, dates of occurrence or other support, Plaintiff claims it was an abuse of discretion to exclude evidence of Gilbert's "prior violent behavior at the workplace," and "that he had sexually harassed women for most of the 37 years that he worked at Cleveland Steel."  (Pl.'s Mot. ¶¶ 14, 35.)  Plaintiff's counsel seems to be of the view that every alleged incident of harassment that ever occurred at Cleveland Steel should have been admissible, despite the fact that no witnesses could establish even a general time frame as to when such harassment occurred.[9]

Plaintiff conveniently fails to mention that she was permitted to present copious evidence of alleged prior sexual harassment by Gilbert.  (See e.g., N.T. June 18, 2010, pp. 29-30, 33-38) (demonstrating that Plaintiff's counsel asked questions at length about Gilbert allegedly staring at women's breasts, pinching coworker Phyllis Plate's breasts and putting a screwdriver to coworker

_____

physical attack that threatened her life.  The evidence presented at trial did not support that rendition of the incident.

[9] For instance, Plaintiff alleges it was an error to exclude an incident in which Gilbert allegedly stared at an unknown Cleveland Steel employee named Mary at an unspecified date.  (N.T. June 18, 2010, pp. 43-45.)  Plaintiff also alleges error in our striking the testimony of Cleveland Steel employee Phyllis Plate that Gilbert had "motioned towards touching her breasts" when such incident had happened fifteen years prior to the alleged conduct in this case.  (Pl.'s Mot. ¶ 43; N.T. June 18, 2010, pp. 242-43.)  Error is also alleged in our preclusion of Cleveland Steel employee Conrad Reid's testimony about Gilbert touching coworker Barbara Yeakel's breasts because Reid could not place it within the last ten years.  (Pl.'s Mot. ¶ 44; N.T. June 21, 2010, pp. 214-16.)

Barbara Yeakel's chest).[10]  Plaintiff also neglects to acknowledge that she was permitted to present evidence of alleged prior incidents of harassment that could be placed within the ten years prior to the trial—a more than ample time period.

Plaintiff next raises a series of claims regarding basic evidentiary rulings.  Where the issue under review is based on a matter such as an evidentiary ruling, the trial court's discretion is broad. Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir.1993).   As previously discussed, in reviewing these types of claims, the court conducts a two-part inquiry: (1) whether an error was in fact committed; and (2) whether that error was so prejudicial that denial of a new trial would be "inconsistent with substantial justice."  Reynolds v. Univ. of Pennsylvania, 747 F. Supp. 2d 522, 534 (E.D. Pa. 2010) (citations omitted).  In determining prejudice under the second prong, "a new trial must be granted unless it is highly probable that [the erroneous ruling] did not affect the [objecting party's] substantial rights."  Id.  (quoting Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600-02 (E.D. Pa. 1989)); see also Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.") In light of these standards, none of the claims raised by Plaintiff even remotely reflects that a denial of a new trial would be "inconsistent with substantial justice."

Plaintiff first claims the Court erred in sustaining an objection to the following question posed to Cleveland Steel employee, Barbara Yeakel: "Did [Gilbert's] staring at your breasts make you feel

---

[10] Pretrial, Defendant's motion in limine to preclude evidence of prior alleged harassment was denied.  (Doc. No. 181.)

uncomfortable?"  (Pl.'s Mot. ¶ 14; N.T. June 18, 2010, p. 147.)  The issues in this case did not involve the subjective feelings of other employees at Cleveland Steel who were not parties to the action.  Even if this question was proper, its preclusion was certainly not so prejudicial as to entitle Plaintiff to a new trial.

Plaintiff next claims that it was error to limit her case, and in particular her counsel's closing argument, solely to the conduct related to the August 1, 2006 box cutter incident, and to exclude arguments regarding Gilbert's other behavior, such as staring at Plaintiff's breasts, following her around the plant to scare her and working beside her, all of which allegedly contributed to the totality of the circumstances of Plaintiff's hostile work environment.   (Pl.'s Mot. ¶ 13.)  This claim, like many others raised by Plaintiff, is directly refuted by the record.

As noted above, Plaintiff was permitted to introduce evidence of prior incidents of alleged harassment by Gilbert.  Plaintiff's counsel also extensively spoke about this in her closing argument, stating: "[Gilbert had] been doing it for a long time.  The man liked breasts" and "One of the most important pieces of information here is the incident with Barbara Yeakel."  (See N.T. June 23, 2010, p. 144.)  Further, the jury was instructed that it must look at the totality of the circumstances and that prior incidents were admissible to determine whether they believed the incident was gender related. (Id. at 18, 79.)

Plaintiff next alleges that it was an abuse of discretion for the Court to exclude incidents of prior harassment suits against Cleveland Steel and Ed Umstead, who she claims had previously sexually harassed other women approximately ten years prior to the incident that occurred here.  (Pl.'s Mot. ¶ 15.)  The two suits at issue were filed by two sisters in 1997, and apparently alleged inappropriate conduct by Umstead between 1995 and 1996. (Def.'s Mot. in Limine, Doc. No. 167.)

This issue was resolved as follows:

> [T]he Umstead lawsuit is not admissible . . . because doing a probative prejudice analysis, I find that the prejudicial effect on the defendant would far outweigh the probative value of a lawsuit that occurred over 10 years ago that was settled, where there was no liability finding at all on the part of this company.
>
> I mean no one knows why the case was settled. Was it settled because the company felt that Mr. Umstead acted completely inappropriately, and, therefore, there was merit to the plaintiff's allegations? Or was it settled because the company thought it was [a] nuisance value settlement and it was appropriate to do so based on economic reasons?
>
> No one knows that . . . .

(N.T. June 15, 2010, pp. 7-8.)  This ruling does not amount to an abuse of discretion.

Similarly, Plaintiff also contends that it was an abuse of discretion for the Court to refuse to admit evidence that Umstead sexually harassed her.  (Pl.'s Mot. ¶ 16.) We did so because an exact time and date as to when this alleged harassment occurred could not be established by Plaintiff. Indeed, Plaintiff's counsel acknowledged that Plaintiff could not remember when she was allegedly touched by Umstead, but offered that a coworker, Barbara Yeakel, would testify that the incident occurred in the summer of  2006.  (N.T. June 18, 2010, p. 217.)  Yeakel was then questioned about this incident outside the presence of the jury, and indicated that she knew it was in the summer but could not remember which year.  (Id. at 219.)  Because Plaintiff had worked at Cleveland Steel for thirteen years, this incident was too vague and imprecise to be deemed admissible, especially because Umstead was never a party to this action.  (Id. at 219-20.)

<div align="center">

2.  Claims Related to a Lack of Adequate Sexual Harassment Training

</div>

In paragraphs 11, 12, 23 and 25 of her motion, Plaintiff alleges the Court wrongly excluded evidence of Cleveland Steel's sexual harassment policy and training.  In order to establish the existence of a hostile work environment against an employer, a plaintiff must prove the following:

<div align="center">

21

</div>

(1) plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) the existence of respondeat superior liability.  Huston v. Proctor & Gamble, 568 F.3d 100, 104 (3d Cir. 2009).  A company's sexual harassment training or policy is not implicated in the first four factors.  As to the fifth factor, when the "hostile work environment" is allegedly created by a victim's non-supervisory coworker, as was alleged here, employer liability "exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  Id.

Pretrial, Defendant filed a motion in limine to preclude evidence that Cleveland Steel did not provide "sexual harassment training" to each of its employees.  Based on the above precedent, we denied this motion because sexual harassment training and policy could be relevant to determining whether Defendant provided a reasonable avenue for complaint or took appropriate remedial action.  In reaching this decision, we noted that "the only evidence of 'training' that will be admissible, will be evidence that relates to whether Defendant provided a 'reasonable avenue of complaint.' . . . Unrelated evidence on the lack of training is not admissible."  (Doc. No. 181.)

We did not, as Plaintiff has suggested, rule sexual harassment training inadmissible.  Rather, we limited this evidence to what the law allows, which is Defendant's training on how to report and to respond to the reporting of sexual harassment.  (N.T. June 15, 2010, pp.  4-9) ("So on the issue of training and/or lack thereof, plaintiff . . . is certainly entitled to pursue that there was some deficienc[y] on who to report to within this company. . . . And I think that this is also appropriate under the remedial action prong of the case law . . .").  The testimony cited by Plaintiff is consistent

with this ruling.[11]  In further support of her claim on this issue, Plaintiff also cites to pages 13-17 of

the trial transcript for June 11, 2010.  However, this portion of the trial deals with voir dire.  Further,

the remainder of the transcript passages cited by Plaintiff concern Plaintiff's counsel's use of leading

questions.

Finally, before her closing, Plaintiff's counsel asked the Court if she could press her allegation

that "the managers who were supposed to take prompt and immediate action right after the incident

was reported to them, did not have sexual harassment training."  We permitted such references, but

reminded Plaintiff's counsel that her comments would be limited to the context of whether "this

company [took] prompt and reasonable steps to remedy the situation.  And the reason -- and the

reasonableness has to go to the alleged lack of training."  (N.T. June 23, 2010, vol. 1, pp. 80-81.)

We believe the rulings as to the sexual harassment policy and training were correct.

Nonetheless, even if the rulings were erroneous, Defendant's training policy was only relevant to the

---

[11] MS. SPERLING:    Have you ever had any training at Cleveland Steel concerning what
                     constitutes sexual harassment?
MS. KOHART:          Your Honor, objection.
THE COURT:           What's your basis?
MS. KOHART:          What difference does it make what other people - - first of all - -
                     you know my position on the training, and why would it be
                     relevant whether the company trains anyone other than Ms. Rorrer,
                     or Mr. Gilbert?
THE COURT:           Yeah
MS. SPERLING:        Your Honor, if I may?
THE COURT:           You can answer the question.
MS. YEAKEL:          No.
MS. SPERLING:        Did anyone ever train you on who you were supposed to report
                     what you thought was sexual harassment to?
MS YEAKEL:           No.

(N.T. June 18, 2010, pp. 144-46.)

fifth element of the <u>Huston</u> test—whether there was an avenue of complaint or whether Defendant responded adequately to the alleged harassment. Indeed, Defendant properly notes that Title VII does not require sexual harassment training for employees, nor does it require any employer to have a particular kind of sexual harassment policy. (Def.'s Resp. ¶ 11.) The jury never reached either issue, as it found Plaintiff did not believe that she suffered severe sexual harassment on August 1, 2006. (<u>See</u> Doc. No. 207.) Thus, any evidentiary ruling on Defendant's response to harassment did not affect the verdict. <u>See</u> <u>Mann v. Mack Trucks, Inc.</u>, 2008 WL 732140, at *3 (E.D. Pa. Mar. 19, 2008) (finding that evidentiary rulings in employment action did not affect the jury's verdict and denying motion for new trial).

      Plaintiff next raises a series of claims, all of which seem to pertain to Cleveland Steel's sexual harassment policy. Specifically, Plaintiff argues:

-   It was "error for the Court to determine that if the prior incidents of sexual harassment did not []rise to the level of hostile work environment, that the company had no duty to correct prior incidents of sexual harassment." (Pl.'s Mot. ¶ 25.)

-   The "Court could not make a factual determination that the prior incidents were not sexual harassment or did not constitute a hostile work environment, as this was invading the province of the jury." (<u>Id.</u> at ¶ 12.)

-   It was an error "to refuse to allow plaintiff's counsel to argue that Gilbert's prior conduct was sexual harassment which the company had a duty to stop or that the policy of the company was inadequate even after Defense counsel, over the Court's explicit instructions, argued the opposite in her closing on two occasions." (<u>Id.</u> at ¶ 25.)

-   The Court committed reversible error in instructing Plaintiff's counsel that she was not allowed to respond to Defendant's closing in which Defendant argued the efficacy of the company's sexual harassment policy and the reporting of the prior sexual harassment to supervisors. (<u>Id.</u> at ¶ 23.)

      First, as noted previously, we correctly ruled that the issue of Defendant's sexual harassment

policy and training was only a relevant consideration to the extent that it pertained to whether Defendant provided a reasonable avenue of complaint and/or took prompt and appropriate steps to remedy the August 1, 2006 incident.  See Huston v. Proctor & Gamble, 568 F.3d 100, 104 (3d Cir. 2009).

Although the admissibility of evidence was framed along these lines, in her closing, Defense counsel briefly discussed the efficacy of Defendant's sexual harassment policy and to whom was the proper person to report. (N.T. June 23, 2010, vol. 1, pp. 125-26, 132-33.) Despite Plaintiff's protests, this does not warrant a new trial.  Even if this was error, the Court immediately instructed the jury to disregard Defense counsel's comments regarding Cleveland Steel employees Paul Gerhart and Phyllis Plate—which we noted constituted only a very small percentage of Defense counsel's closing—and to consider only whether the Defendant made a prompt and adequate response after it learned of the August 1, 2006 incident.  (Id.)  While Plaintiff's counsel disagreed with our curative instruction, arguing that she should be allowed to talk about whether or not Plate and Gerhart were supervisors and whether or not information presented to them should have been passed up the chain, our instruction was nevertheless appropriate.  (N.T. June 23, 2010, vol. 1, 136-39.)  Additionally, the error was not prejudicial because the jury never reached the issue of Defendant's response to the alleged harassment.  (See Doc. No. 207.)

Plaintiff next claims it was error to exclude evidence that the "supervisors" at Cleveland Steel had heard rumors of sexual harassment of other women, which according to Defendant's sexual harassment policy and handbook, should have been reported to upper management.  (Pl.'s Mot. ¶ 56.) Based on her contention that Plate and Gerhart were supervisors, Plaintiff argued that evidence that they had heard rumors of women complaining about Gilbert was relevant to whether Defendant knew,

or should have known, of prior alleged harassment.  (N.T. June 21, 2010, pp. 147-49; see also N.T. June 18, 2010, pp. 261-62.)  However, there was no evidence that either Plate or Gerhart were supervisors.  In fact, both testified that they were not supervisors.  (N.T. June 18, 2010, p. 247; N.T. June 21, 2010, pp. 125-26, 146.)  Therefore, the objections to Plaintiff's questions of whether either had heard that women were complaining about Gilbert were properly sustained, and, in any event, such responses would have constituted hearsay.  Even if any of these rulings were erroneous, they were not prejudicial as the jury never reached the issue of Defendant's avenue of complaint or response to the alleged sexual harassment.  (See Doc. No. 207.)

Plaintiff also alleges that it was error for the Court to exclude evidence that part-time workers were not allowed to attend sexual harassment training sessions.  (Pl.'s Mot. ¶ 52.)  In support of this claim, Plaintiff cites to questions asked of Cleveland Steel employee Barbara Yeakel.  Our review of the trial transcript reflects that the only question asked by Plaintiff's counsel that was not allowed was the following:   "Do you know whether or not there was sexual harassment training that was held at Cleveland Steel on a Friday that you did not attend?"  (N.T. June 18, 2010, p. 150.)  This question seems unrelated to Plaintiff's claim and, in any event, and as explained previously, we ruled pursuant to Huston that counsel's questions were outside the perimeters we set on "training" questions.  (Id. at 150-51.)

Plaintiff further contends that it was an error to exclude testimony that Gilbert had sexually harassed other women after Plaintiff left her employment at Cleveland Steel.  (Pl.'s Mot. ¶ 55.)  The incident allegedly giving rise to Plaintiff's claimed post-traumatic stress disorder occurred on August 1, 2006.  We are at a loss to understand how Gilbert's alleged harassment after that date was relevant or how that would warrant a new trial.

26

### 3. Claims Relating to Expert Witnesses

Plaintiff next claims it was error to refuse to allow her expert, Dr. Toborowsky, to testify regarding how he relied on Defense expert Dr. Steinberg's independent medical examinations.  (Pl.'s Mot. ¶ 18.)  This testimony was excluded because Dr. Steinberg's report had not been admitted into evidence.  Plaintiff fails to mention that Dr. Steinberg was also not permitted to testify regarding Dr. Toborowsky's report, and that the Court ruled that if Dr. Toborowsky wanted to remain in the courtroom for Dr. Steinberg's trial testimony, he could possibly be recalled as a rebuttal witness.  (N.T. June 17, 2010, pp. 252-53.)   Plaintiff chose not to have Dr. Toborowsky testify after Dr. Steinberg and, therefore, she cannot now claim she was prejudiced.

### 4. Damage Claims

Plaintiff also asserts that the Court erred by limiting her medical damages through the date of trial because she will be incapacitated for the rest of her life.  (Pl.'s Mot. ¶ 38.)  Aside from the fact that there was no testimony to support the fact that Plaintiff will suffer from post-traumatic stress disorder indefinitely, (see N.T. June 17, 2010, p. 70) (indicating Dr. Toborowsky's opinion that Plaintiff's prognosis was "uncertain"), the jury did not find Defendant liable and thus any possible error regarding damages is irrelevant.  See Markovich v. Bell Helicopter Textron, Inc., 805 F. Supp. 1231, 1241 (E.D. Pa. 1992) (finding that "since the jury never reached the issue of damages because it found that the bolt in question was not defective, any error relating to the damages instructions would be harmless").

### 5. Issues Related To Plaintiff's Family, Finances and Counsel Letter

Plaintiff next claims it was an abuse of discretion to preclude her family from testifying about her statements to them regarding her alleged emotional distress.  (Pl.'s Mot. ¶ 21.)  The Court

properly sustained hearsay objections to these questions, but allowed Plaintiff's sister to testify as to her observations of Plaintiff.  (N.T. June 15, 2010, pp. 104-05.)  Louis Rorrer, Plaintiff's husband, was also allowed to testify about Plaintiff's nightmares and crying.  Further, Plaintiff's counsel was permitted to show Plaintiff's doctors' records to Mr. Rorrer and question if he had witnessed the symptoms listed.   (See N.T.  June 21, 2010, pp. 250-57.)  Plaintiff was given more than enough opportunity to establish her alleged condition.

Plaintiff's next claim states:  "It was error to preclude the plaintiff from asking questions concerning the Rorrer's financial condition, and it was even more prejudicial to allow the defense to raise the issue of the Rorrer's greed for money after unduly limiting the plaintiff's examination." (Pl.'s Mot. ¶ 22.)  Review of the trial transcript reflects that this issue essentially pertains to Plaintiff's financial motives in pursuing a lawsuit.  This issue first arose when Plaintiff's counsel asked Plaintiff's husband about having claimed bankruptcy in the 1990s, and how he felt about the bankruptcy.  After Defense counsel proffered that she did not intend to explore the bankruptcy on cross-examination, Defendant's objection regarding further questioning on this issue was sustained. (N.T. June 21, 2010, pp. 252-53.)

Plaintiff also points to the testimony of Defendant's expert, Dr. Steinberg, who stated:  "The second diagnostic impression I had was that Ms. Rorrer was potentially at least a partial malingerer that these symptoms that she had were exaggerated for some secondary gain, some personal gain. And typically that gain is somebody gets out of work or they get service compensation from the military or they get a disability benefit . . . . "  (N.T. June 22, 2012, p. 64.)  Plaintiff's counsel objected to this testimony claiming that she had been precluded from rebutting the inference that Plaintiff was motivated by financial gain.  All of this background aside, Plaintiff's counsel was

28

ultimately allowed to re-call Mr. Rorrer and ask him questions about the bankruptcy, and re-call Plaintiff, over Defendant's objections, to rebut Dr. Steinberg's opinion that she was malingering. (N.T. June 22, 2010, pp. 64-66, 74-75, 123-26; N.T. June 23, 2010, vol. 1, pp. 74-75.) Under these circumstances, we are at a loss to understand why a new trial is warranted.

Plaintiff also contends that evidence which established that her brother-in-law had been involved as a plaintiff in a personal injury suit should not have been admitted. This evidence established that Plaintiff's brother-in-law had recently been involved in a significant lawsuit, and was present at Plaintiff's house when she came home from Cleveland Steel on August 1, 2006. As this evidence could relate directly to Plaintiff's motives to pursue a lawsuit, its admission was not error. (N.T. June 15, 2010, pp. 107-08.)

Plaintiff next complains about the admission of a letter from Plaintiff's counsel to Cleveland Steel written approximately two weeks after the box cutter incident. (Def.'s Trial Ex. 4; Pl.'s Mot. ¶ 34.) This letter stated that Plaintiff was suffering from such anxiety that she was unable to return to work. The letter was admitted only for the purpose of establishing that Plaintiff had, two weeks after the incident, and without consulting a doctor, determined she could not return to work. Our Order of May 19, 2010 addressed this issue and stated that the letter was admissible "with the understanding that Plaintiff will have the opportunity to explain [it]." (Doc. No. 181.) Defendant introduced the letter into evidence. When Plaintiff's counsel later asked Plaintiff to read the letter to the jury, Defense counsel suggested that the second paragraph be redacted, as this paragraph requested that Defendant pay Plaintiff her salary until she could return to work. We determined that if the paragraph were introduced, it would be unfair for the jury to have the impression that Plaintiff was not compensated for her absence from work when in fact she received a substantial workers'

compensation award.  Thus, we ruled that, unless Plaintiff's counsel agreed to tell the jury that Plaintiff was compensated through workers' compensation, that paragraph should be omitted. Plaintiff's counsel did not do so and the paragraph was redacted.  (N.T. June 16, 2010, pp. 224-26.) There was no prejudice in redacting Plaintiff's request for compensation.

Plaintiff next claims that it was "error to exclude as hearsay statements that the corporation's managers made to Louis and Lucy Rorrer during an investigation of the report of sexual harassment . . . [and] an abuse of discretion to admonish [Plaintiff] for giving too much of an answer in response to an open-ended question."  (Pl.'s Mot. ¶ 45.)  Despite our clear directive that Plaintiff's counsel provide record cites to assist the Court in considering her claims of error, Plaintiff has failed to do so. Consequently, we cannot examine the record and respond to this claim.

Plaintiff next contends it was an abuse of discretion to sequester Louis Rorrer from the courtroom as he had previously been a plaintiff in the case and was necessary emotional support for his "disabled wife."  At trial, in support of this position, Plaintiff's counsel relied on a case where a thirteen-year-old had been raped and needed her mother in the courtroom, and thus the sequestration rule was relaxed.  Certainly, the instant case is not comparable.  Nonetheless, Plaintiff's counsel continues to make inflammatory, unsupported allegations, and urges that Defendant "forced the sequestration to inflict emotional harm upon Mrs. Rorrer and not for any legitimate reason."  Plaintiff further alleges that "[t]he Court knew this and failed to act."  (Id. at 48.)

Federal Rule of Evidence 615 states:

At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony.  Or the court may do so on its own.  But this rule does not authorize excluding: (a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be

essential to presenting the party's claim or defense; or (d) a person authorized by statute to be present.

FED. R. EVID. 615.  Defendant requested that all potential witnesses—including Louis Rorrer, who was not a party—be sequestered.  Defendant believed Mr. Rorrer was "the clean-up witness for the plaintiff and sequestration was important so that his testimony would not be influenced by the prior testimony of other fact witnesses." (Def.'s Resp. ¶ 48.)  Mr. Rorrer does not fit into any of the above-mentioned exceptions to the sequestration rule, nor has Plaintiff argued that he did.  Therefore, our ruling was proper.

### 6.  Miscellaneous Allegations of Improperly Admitted Evidence

Plaintiff alleges that the Court erred in allowing Defense counsel to bring a box cutter into the courtroom "to frighten plaintiff and prejudice her fair trial," and in refusing to remove the box cutter from the courtroom.  Plaintiff's counsel goes on to state that the presence of the box cutter "prejudicially impact[ed] Plaintiff's] ability to concentrate and forc[ed Plaintiff] to take extra medication, thereby prejudicing her right to a fair trial and hampering her effective participation in the trial." (Pl.'s Mot. ¶ 4.)  These claims are simply untrue and are directly contradicted by the record.

Contrary to Plaintiff's representations, the box cutter, when not in the courtroom deputy's pocket, was kept out of the sight of everyone, especially the Plaintiff.  The box cutter was never used during the trial, nor was it ever seen by anyone in the courtroom.  Plaintiff never testified or indicated in any way that she could see the box cutter or that she was negatively impacted by having it in the courtroom.  In fact, the record reflects that Plaintiff's counsel's request that the box cutter be kept out of the view of her client was honored.  The trial transcript states as follows:

THE COURT:          Bring in the jury, please.
                    Is someone going to use the box cutter in their opening?

| | |
|---|---|
| MS. KOHART: | No, Your Honor. |
| THE COURT: | Okay.  Mr. Sonnie has it. |
| MS. SPERLING: | Your Honor, I would ask the box cutter not be placed out on the table. |
| THE COURT: | It's right there, Ms. Sperling, <u>where you can't see it</u>.  <u>So that's what you wanted, right?</u> |
| MS. SPERLING: | <u>Thank you.</u> |

(N.T. June 15, 2010, p. 24) (emphasis added.)   This baseless, unsupported claim is yet another example of Plaintiff's counsel's willingness to blatantly misquote the record.

Plaintiff next claims it was error to allow Defendant to admit exhibits during her case in chief. (Pl.'s Mot. ¶ 46.)  Plaintiff does not cite to any part of the record or to law to support this claim, nor does she explain how she was prejudiced.  Therefore, this claim fails.

Plaintiff also asserts it was error to allow Defense counsel to mention that Gilbert had previously been sued.  (<u>Id.</u> at 47.)  Gilbert, Plaintiff's alleged harasser, was a defendant in this case until he was dismissed at the summary judgment stage.  Plaintiff does not explain why this was error or how she was prejudiced by this evidence.  Thus, this claim also fails.

Plaintiff next raises additional claims about Gilbert, alleging it was an abuse of discretion to allow Defense counsel to speak of Gilbert's mental capacity in her opening statement.  There, Defense counsel noted that Gilbert was retarded, had a bad hand, had recently attempted suicide and that his mother had just died.  (<u>Id.</u> at 49.)   In raising this issue, Plaintiff's counsel neglects to mention that in her opening statement she stated:  "Richard Gilbert had some problems, and you'll see him on the stand.  He's weird.  The women thought he was crazy." (N.T. June 15, 2010, p. 31.)  It is also worth noting that Plaintiff's counsel incredibly compared Gilbert to a serial murderer in her closing, stating:

32

"You know Allan [sic] Berkowitz, who's named Son of Sam, was a low IQ person who had a lot of social problems. It didn't excuse him murdering people and it didn't make other people safe." (N.T. June 23, 2010, p. 147.) We are at a complete loss to understand how Plaintiff's counsel could compare Gilbert to a serial murderer, while at the same time complain that Defense counsel described his depression and decreased mental capacity. If Plaintiff's counsel did not want Gilbert's impaired social skills addressed, she should not have opened the door to that issue during her opening statement. (N.T. June 15, 2010, pp. 55-58.)

Plaintiff also contends that the Court erred in allowing Defense counsel "to play a simulation of the box cutter incident in its opening statement which was never introduced at trial." (Pl.'s Mot. ¶ 50.) Again, Plaintiff's cites to the record in support of this claim have little bearing on this issue. Nonetheless, it is unclear how Defense counsel's opening reference to a demonstrative exhibit (D-17) that simply depicted where Plaintiff and Gilbert were positioned, and subsequent failure to use this exhibit amount to error necessitating a new trial. As the positioning of Plaintiff and Gilbert was essentially undisputed, this claim is baseless.

Plaintiff next alleges it was error for the Court to restrict her counsel's questioning of Gilbert regarding his opinions on the breast size of Plaintiff and other Cleveland Steel employees, and how frightened Plaintiff may have been by the August 1, 2006 incident. (Id. at 51.) Plaintiff's counsel, once again, misrepresents the record.

Over the objection of Defendant, Plaintiff's counsel was permitted to ask Gilbert whether he looked at his coworkers' breasts and whether he tried to look down women's shirts when they bent over. (N.T. June 18, 2010, pp. 29-30.) However, Defendant's objections to the following questions posed by Plaintiff's counsel were sustained: "Does Lucy Rorrer have large breasts?;" "Did you ever

notice whether or not Barbara Yeakel has large breasts?;" "How about Debbie Ohl, did you ever notice whether or not she has large breasts?"  (Id. at 28-29.)  These types of questions are hardly relevant, and border on offensive.  In addition, Plaintiff has not even remotely explained how precluding the answers to these questions caused any prejudice.

Furthermore, regarding the Court's alleged restriction of Plaintiff's counsel's questioning of Gilbert on whether Plaintiff was frightened, the record directly refutes Plaintiff's allegations.  Plaintiff's counsel asked numerous, redundant questions on this topic.[12]

### D.  Issues Arising from Jury Instructions

Under Federal Rule of Civil Procedure 51(c)(1), a "party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  FED. R. CIV. P. 51(c)(1).  Further, "[m]erely proposing a jury instruction that differs from the charge given is insufficient to preserve an objection."  Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336, 339 (3d Cir. 2005).  A party's "failure to object to either the court's instructions or the verdict sheet constitutes a failure to preserve its presumed damages objection.  Id. at 340 (citing Neely v. Club Med Mgmt. Servs., Inc., 63 F.3d 166, 200 (3d Cir.1995) (en banc)).

We note that a number of Plaintiff's claims regarding jury instructions were not objected to on the record and therefore have not been preserved.  (See Pl.'s Mot. ¶¶ 6, 17, 37, 40.)

---

[12] See N.T. June 18, 2010, pp. 40-43, 46-50, for Plaintiff's counsel's questioning of Gilbert on whether Plaintiff was frightened, including the following exchange:

MS. SPERLING:    What did her face look like when she turned and looked at you with the box cutter in her breasts?

MR. GILBERT:     Like she was scared.

Plaintiff first alleges that "[i]t was [an] error of great magnitude for the Court to refuse to charge the jury to consider the totality of the circumstances in a case of sexual harassment."[13]  As noted above, Plaintiff has waived her right to raise this argument as she did not include the totality of the circumstances language in her proposed jury verdict form or propose inclusion of such language during the charge conference.  (See Doc. No. 199.)  In any event, "totality of the circumstances" language was included in our instructions to the jury.  (N.T. June 24, 2010, vol. 1, pp. 21-22.)[14]  This is yet another example of Plaintiff's counsel's willingness to raise claims that are directly contradicted by the record.

Plaintiff also claims it was error to instruct the jury that the incident had to be "extremely serious" and "involve physical harm" in order to be severe enough to affect Plaintiff's working environment.   (Pl.'s Mot. ¶ 37.)  Plaintiff's counsel did not object to this instruction at any time— either before or after this instruction was given.  Moreover, Plaintiff's counsel's statement that our instruction on the incident required the event to be "extremely serious" and involve physical harm is

---

[13] We note that, once again, Plaintiff has not provided a citation to the record to support her claim.  Plaintiff cites to page 9 of the June 23, 2010 trial transcript, which does not pertain to the instant issue.

[14] THE COURT:      It is important to understand that in determining whether a hostile work environment existed at Cleveland Steel's factory, you must consider the evidence from the perspective of a reasonable woman in the same position.  That is, you must determine not just whether Lucy Rorrer was offended, but whether a reasonable woman would have been offended or harmed by the conduct in question.

               You must evaluate the totality of the circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would detrimentally affect a reasonable person of the same sex and the same position.

(N.T. June 24, 2010, vol. 1, at 21:20-22:6) (emphasis added.)

35

misleading and inaccurate.  The Court's instructions regarding a hostile work environment were proper and included a full explanation of what that term entails.  (See N.T. June 24, 2010, vol. 1, pp. 20-21.)  The phrases relied upon by Plaintiff were referred to as follows:

> A hostile work environment can be found only if there's extreme conduct amounting to a material change in the terms and conditions of employment.  Moreover, isolated incidents, unless extremely serious and involving physical harm, will not amount to a hostile work environment.

(Id. at 21:6-10.)  This statement does not, as Plaintiff represents, instruct that the August 1, 2006 incident must have been "extremely serious" and involve "physical harm."  Rather, it instructs that "isolated incidents, unless extremely serious and involving physical harm, will not amount to a hostile environment."  Further, our instruction was in accord with Title VII case law.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (stating that single or isolated incidents are insufficient to affect a change in the terms and conditions of employment, and thus constitute a hostile work environment, "unless extremely serious") (emphasis added); see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (stating that a single incident, unless extraordinarily severe, does not meet the threshold of severity necessary to establish a hostile work environment).

Plaintiff next claims it was error to refuse to instruct the jury that the proper test for the subjective prong of a hostile environment case is whether or not Plaintiff had proven that she was detrimentally affected by the harassment, and not whether or not "she believed Mr. Gilbert's August 1, 2006 conduct towards Ms. Rorrer[] was severe enough to render her work environment hostile or abusive."  (Pl. Mot. ¶ 40.)  This claim is baseless for several reasons.

First, the Third Circuit's Model Civil Jury Instruction 5.1.5 states that a plaintiff must "believe" her work environment is hostile or abusive.  Our instruction was entirely consistent with what the

Third Circuit recommends:

> THE COURT:        Fourth -- and these are the elements that the plaintiff has to
> prove -- Lucy Rorrer believed that Gilbert's conduct towards
> her on August 1st was so severe that her work environment
> was hostile or abusive as a result of his conduct such that Ms.
> Rorrer was detrimentally affected.

(N.T. June 24, 2010, vol. 1, p. 18.)  Moreover, Plaintiff's counsel specifically suggested and agreed

to the "detrimentally affected" language she now complains about:

> MS. SPERLING:    And I like much better the wording that you used in the cases
> that you've cited, rather what her belief was whether or not the
> work environment was hostile or abusive.  The language that
> you used in your summary judgment motion at page 9 --
> summary judgment order at page 9 was, "Did the
> discrimination detrimentally affect the plaintiff?"
>
>                          . . .
>
> MS. KOHART:      ". . . And I thought perhaps the compromise could be, hostile
> or abusive as a result of Richard Gilbert's conduct such that
> the plaintiff was detrimentally affected."
>
>                          . . .
>
> MS. SPERLING:    "Yes, that's fine."

(N.T. June 23, 2010, vol. 2, pp. 12 -16.)

Similarly, Plaintiff claims it was prejudicial error to "confound the jury" in the Final Verdict

Form regarding question three, which read: "Do you find that Ms. Rorrer proved by a preponderance

of the evidence that she believed that Mr. Gilbert's August 1, 2006 conduct towards Ms. Rorrer, was

severe enough to render her work environment hostile or abusive?"  (Doc. No. 207.)  Plaintiff

contends that the question should have read: "Was the conduct severe or pervasive enough to render

her work environment hostile or abusive?"  Plaintiff suggests that a second question then should have

been posed, which should have read: "Did the conduct detrimentally affect Ms. Rorrer?" (Pl.'s Mot. ¶ 17.) We are at a loss to understand how the difference in the two questions constitutes error. Moreover, during the jury instruction charge conference, Plaintiff's counsel did not request that the questions be separated and, in any event, the question on the Final Verdict Form tracked the language used in the actual instruction language, which Plaintiff's counsel specifically agreed to. Thus, Plaintiff has waived her right to raise this argument.

Plaintiff additionally argues it was error for the Court to submit the Final Verdict Form to the jury without giving counsel a chance to comment or correct the final version. (Id.) This claim is also directly refuted by the record, which clearly reflects extensive discussion with Plaintiff's counsel regarding the verdict form. (N.T. June 23, 2010, vol. 2, pp. 53-62.).

Plaintiff further asserts that it was error to refuse to instruct the jury that Defendant could be responsible for the subsequent decisions of Plaintiff's treating physicians. (Pl.'s Mot. ¶ 7.) In support of this claim, Plaintiff cites to Restatement of the Law of Torts § 457, which reads:

> If the negligent actor is liable for another's injury, he is also liable for any additional bodily harm resulting from acts done by third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner.

RESTATEMENT (FIRST) OF TORTS § 457. We refused to give this instruction because Plaintiff was unable to present us with any precedent to support the position that a defendant in a Title VII or PHRA case can be held responsible for the subsequent negligent decisions of a treating physician. (See N.T. June 23, 2010, vol. 1, pp. 165-66; N.T. June 24, 2010, vol. 1, pp. 6-7.)

Plaintiff also complains about our additional instruction given in response to Plaintiff's counsel's statement in closing that Cleveland Steel was responsible for the treating decisions of

Plaintiff's physicians.[15]  This is simply not the law in a Title VII case and thus a follow-up instruction was warranted.  This instruction simply stated:  "In addition, an additional instruction, members of the jury, is that Cleveland Steel is not responsible for treating decisions of Ms. Rorrer's physicians, including the prescription medications that she was on."  (N.T. June 24, 2010, vol. 1, p. 37.) Regardless, the jury never reached the issue of whether Cleveland Steel was liable for whatever injuries Plaintiff may have suffered, and thus responsibility for any harm caused by Plaintiff's physicians is irrelevant.  (See Doc. No. 207.)

Next, citing the entire charge conference as support, Plaintiff claims it was error to refuse to instruct the jury generally as she requested.  (Pl.'s Mot. ¶ 36.)  This objection is overly broad and is not specific enough to properly address.  See Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336, 339 (3d Cir. 2005) ("Merely proposing a jury instruction that differs from the charge given is insufficient to preserve an objection.").  While Plaintiff does point to the Court's limitation of the "severity test to the events of August 1, 2006" and "the unnecessary and prejudicial length and scope of the jury interrogatories" as examples of the Court's alleged errors, she fails to provide appropriate cites to the record and law to support her contention.  Regarding the limitation of the severity test, we

---

[15] In her closing argument, Plaintiff's counsel stated:

> The Judge will instruct you that Cleveland Steel is actually responsible.  If they're responsible for anything, they're not only responsible for her emotional distress, they're also responsible if the doctors are mistreating her.  They're also responsible for the doctors giving her too much medication because the law doesn't say if I hit somebody with a car and they break their leg and it should have gotten better but the doctor accidentally amputates the leg, that I'm not responsible for the broken leg and the amputation.  I have to pay more money because somebody else messed up, because I started the injury.  So all of this stuff about Lucy Rorrer being overmedicated is nothing in this case . . . .

(N.T. June 23, 2010, vol. 1, pp. 145-146.)

dismissed the pervasive claim in granting Defendant's Rule 50 motion and thus the only issue for the jury was whether the August 1, 2006 incident was severe.  In accordance with that ruling, evidence of Defendant's responses to alleged prior incidents was irrelevant.  Furthermore, even if our ruling was in error, there is no prejudice because the jury never reached the question of whether Defendant's response to the alleged harassment was appropriate.  (See Doc. No. 207.)

With respect to the length and scope of the jury interrogatories, Plaintiff had an adequate opportunity to make objections during the lengthy discussion between the Court and counsel on June 23, 2010.  (See N.T. June 23, 2010, vol. 2, pp. 53-62.)  Although Plaintiff's counsel (Ralph E. Lamar, IV) did in fact object to the separation of questions six and seven, he conceded that he "was not concerned about the number of questions" on the Final Verdict Form.  (Id. at 59:1-5.)  Additionally, Plaintiff made no specific objections regarding the general scope or length of the interrogatories.  In any event, the jury only completed three questions so there is no prejudice.

Plaintiff's counsel also asserts that the Court instructed her in an unidentified telephone conference that she should be prepared to prove to the jury the five elements of a hostile environment case, but that the Court then gave instructions on seven elements, "leading the jury to believe that plaintiff's counsel was deliberately misleading them."  (Pl.'s Mot. ¶ 39.)  As Plaintiff does not provide a cite to the record and we have no memory of this conversation, we simply do not know how to respond to this claim, and can only state that the  instructions given to the jury were taken from the Third Circuit Model Jury Instructions.

### E.  Court's Alleged Prejudice Against Plaintiff's Counsel

The remainder of Plaintiff's claims revolve around her counsel's belief that the Court treated her unfairly and intentionally prejudiced her case in retaliation for her decision not to settle the matter.

We have thought long and hard as to whether further judicial resources should be expended to respond to each and every claim on this issue raised by Plaintiff. Indeed, we are confident that a complete review of the trial record reflects that the Court went to great lengths to be fair and impartial to both parties. That being said, because most of Plaintiff's claims are either totally refuted by the record or unnecessarily inflammatory, we will take the time to respond to most of these allegations.[16]

As we have continually stressed, all of the Court's resolutions of the unending disagreements between counsel were conducted outside the presence of the jury. The record squarely bears this out. The Supreme Court has commented on situations where allegations are raised that a trial judge was partial:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

Liteky v. United States, 510 U.S. 540, 555 (1994); see also Johnson v. Trueblood, 629 F.2d 287, 291 (3d. Cir. 1980) (finding that a judge's statements made at a settlement conference are not necessarily "extrajudicial," provided they are based on the Court's evaluation of the evidence and "other materials outlining the nature of the case").

Regarding her claims of lack of impartiality, Plaintiff first contends that it was a prejudicial error to fail to stop Defendant's counsel from "misbehaving in the courtroom." Plaintiff inaccurately cites to one incident to support this claim, claiming that the Court singled her out "to turn around in her chair and apologize to the gallery for shaking her head on one occasion in disagreement with

---

[16] We note that, while we do not address all of Plaintiff's allegations of prejudice, we have reviewed the remaining claims asserted by Plaintiff and find that they are without merit.

defense counsel's arguments."  (Pl.'s Mot. ¶ 29.)  Once again, this claim is not supported by the record.

As this trial was held during the summer, many summer interns and clerks visited the courtroom to observe the trial.  After contending with counsel's constant bickering and personal attacks on each other, it was the Court's hope that alerting the attorneys that many clerks, interns, and young lawyers were observing would motivate them to act in a more professional manner.  Towards the end of trial, and after days of this unprofessional behavior, the Court ordered <u>both</u> counsel to turn around and face the gallery:

> THE COURT:  " . . . I want <u>both</u> lawyers to turn around -- and look -- turn around -- I'm ordering you to both turn around and look into the -- look into the courtroom.  I'm ordering both of you to turn around --
>
> MS. SPERLING:  To do -- where?
>
> THE COURT:  -- and look into the courtroom.  Thank you. Sitting in the courtroom for the last week and a half -- all right, Ms. Sperling, thank you -- have been clerks, summer clerks, law students and persons who have come into this courtroom and who would have hoped that they would have learned something about the professionalism of  -- of lawyers in this courthouse.

(N.T. June 23, 2010 , vol. 1, p. 134) (emphasis added.)  Contrary to Plaintiff's counsel's claim that she was singled out, <u>both</u> lawyers were admonished.  Plaintiff's counsel's citing to this occurrence as an example of the Court's lack of impartiality is, unfortunately, just a continuation of her unprofessional approach to this case.

Plaintiff's counsel also alleges that the Court's "disregard and disdain" for her led Defendant's

counsel to make "even more constant personal attacks."  (Pl.'s Mot. ¶ 29.)  Plaintiff cites to the following exchange in support of this claim:

| | |
|---|---|
| MS. SPERLING: | Mrs. Kohart is muttering things under her breath, such as -- |
| THE COURT: | All right. Stop muttering things under your breath. |
| MS. SPERLING: | -- such as, "Mrs. Sperling must be on drugs." |
| MRS. KOHART: | I did not say that. |
| THE COURT: | All right.  Look -- all right.  Do -- do we need to take this up right now – |
| MRS. KOHART: | How dare you! |
| THE COURT: | Do we need to take this up now with these good folks sitting here? |
| MS. SPERLING: | Yes. |

(N.T. June 18, 2010, pp. 275-76.)  This exchange should be embarrassing to both attorneys and is illustrative of the level of contention between them.

In a similar vein, Plaintiff claims that the Court reprimanded Plaintiff's counsel for unethical behavior, but did not reprimand Defendant's counsel for similarly unethical behavior.  Plaintiff makes three specific allegations, all of which are baseless. (Pl.'s Mot. ¶ 57.)

Plaintiff's counsel first alleges that Defense counsel violated Rule 4.2 of the Rules of Professional Conduct by contacting her witness, Barbara Yeakel, after Yeakel indicated she was represented by counsel.  Based on this allegation, a hearing was held in the middle of the trial, and Yeakel testified about a phone call she allegedly received from Defendant's counsel.  (N.T. June 18, 2010, pp. 232-36, 301-11.)   We permitted Plaintiff's counsel to question Yeakel on this and the

Court then asked: "Based on that record, Mrs. Sperling, do you have any motions?"  Plaintiff's counsel responded: "No, Your Honor." (Id. at 310-311.) Thus, Plaintiff's counsel was afforded the opportunity to pursue this issue, but declined to do so.

Second, Plaintiff alleges that Defense counsel should have been reprimanded for questioning a witness about having been previously represented by Plaintiff's counsel. (Pl.'s Mot. ¶¶ 54, 57.) Plaintiff's counsel objected to questioning on this issue, and at sidebar, Defense counsel agreed to table the matter. (N.T. June 18, 2010, pp. 175-77.) Neither party brought up the issue again.

Third, Plaintiff claims that based on the Court's ruling on a motion in limine, it was prejudicial error for the Court to fail to correct Defense counsel for having "unfairly mention[ed] workers' compensation at least four times," and for admitting a medical record that discussed workers' compensation. (Pl.'s Mot. ¶ 26, 57.) The Court granted Plaintiff's "Motion in Limine to Exclude Evidence of Plaintiff Lucy Rorrer's Receipt of Workers' Compensation Benefits" (Doc. No. 130) "to the extent that Plaintiff has moved to preclude the jury from considering evidence of the workers' compensation payments to Plaintiff" (Doc. No. 181).   Nonetheless, "workers' compensation" was mentioned briefly in the course of the trial:  Defense counsel described what Plaintiff had told the judge in her workers' compensation case in her opening argument;[17] Defense counsel cited to the workers' compensation record for impeachment purposes;[18] and Plaintiff's

---

[17] MS. KOHART:          "Now Mrs. Rorrer told -- what I just told you happened, was what
                         Mrs. Rorrer said to Phyllis Plate, it is what she told Rich Mayo, the
                         plant manager, it is what she told the EEOC, it is what she told a
                         Judge in Doylestown in Workers' Compensation --"

(N.T. June 15, 2010, p. 52.)

[18] MS. KOHART:          Do you have the Worker's Comp transcript?
    THE COURT:           Could we -- could we abide by prior rulings, please, in reference to

expert referred to the transcript of a workers' compensation hearing during cross-examination on two occasions.[19]   None of these instances even remotely indicated that Plaintiff had previously been awarded workers' compensation.

The brief references to workers' compensation noted above, including two by Plaintiff's expert witness, do not in any respect necessitate a new trial.  Moreover, the jury never addressed the issue of damages and thus Plaintiff was not prejudiced by these references. (See Doc. No. 207.)

Plaintiff continues to point to the Court's alleged "bias" in claim thirty-three with a laundry list of complaints.  Plaintiff's counsel complains about the Court's alleged refusal to sanction Defense counsel for her "unethical conduct" in using ex parte conversations with Louis Rorrer, her misuse of the subpoena power, her ex parte conversations with represented witnesses and her influencing of witnesses not to talk to Plaintiff's counsel.  There are no cites to the record to support these allegations nor is there any factual support offered by Plaintiff.  (Pl.'s Mot. ¶ 33.)

Plaintiff also asserts that the Court erred in directing the jury to disregard Dr. Toborowsky's testimony concerning "a proper second interview with the plaintiff."  She claims the interview was

---

<div style="margin-left:2em">

MS. KOHART:    this transcript?<br>
                     Oh, yes, Your Honor.

</div>

(N.T. June 16, 2010, p. 103.)

[19] MS. DEAL:    Am I correct that this is a transcript of testimony?
DR. TOBOROWSKY:  It looks like it's a Worker's Compensation hearing.

MS. DEAL:    Okay.  Now, you didn't have an opportunity to review Ms. Rorrer's sworn testimony about this incident before you issued your opinion, correct?
DR. TOBOROWSKY: You mean in the Worker's Comp hearing transcript?

(N.T. June 17, 2010, pp. 166, 168.)

"not a discovery violation, it was not done in bad faith and was not prejudicial." Plaintiff further claims the Court abused its discretion in allowing Defendant to cross-examine the doctor on the "alleged discovery violation." (Id. at 19.)

Upon further review and reflection of the sanctions levied against Plaintiff's counsel for discovery violations, we stand by our conclusion that such sanctions were proper and warranted. Our reasoning for these sanctions is fully explained in our Order of September 20, 2010 (Doc. No. 236).[20]

Plaintiff also objects to having been sanctioned for arriving late in violation of this Court's Order. (Pl.'s Mot. ¶ 53.) What Plaintiff's counsel does not mention is that due to the incessant bickering between counsel, which caused inordinate delays for the jury, the Court instituted a schedule whereby counsel were to meet and confer regarding exhibits and other trial issues before the jury was seated. On the first day that this schedule was to be implemented, Plaintiff's counsel arrived late, and was not prepared to discuss or exchange exhibits. (N.T. June 18, 2010, pp. 5-7.) It was noted, however, that if Plaintiff's counsel began to abide by the Court's orders we would consider lifting the sanctions, which we did on June 23, 2011. (N.T. June 18, 2010, p. 226; N.T. June 23, 2010, vol. 1, p. 72.)

In paragraph twenty-seven, Plaintiff's counsel lays out a litany of complaints and accusations against the Court, which she proclaims definitively demonstrate that the Court belittled her, "openly derid[ed] plaintiff's case in front of . . . the jury" and called into question her professionalism, especially for her crying episodes during the course of the proceedings. We take the time here to examine the record, which, not surprisingly, demonstrates that counsel's claims are baseless, and

---

[20] We note that Plaintiff's counsel appealed this Order on September 30, 2010 despite the fact that the present motion for new trial was pending. The Third Circuit dismissed the appeal for lack of jurisdiction on January 25, 2011. (Doc. No. 247.)

reflects counsel's continued willingness to misquote the record.

The record cites supplied by Plaintiff's counsel in support of the above-mentioned claims reflect the following:

- The Court stating, " that's [an] example . . . of a proper question," (N.T. June 15, 2010, p. 18);

- The Court directing Plaintiff's counsel, when making an objection, not to speak directly to Defense counsel but to simply state her objection, (N.T. June 16, 2010, p. 129);

- The Court advising Plaintiff's counsel at sidebar, and out of the hearing of the jury, that it appeared to be a waste of time to require the defense to subpoena numerous custodian of records witnesses to authenticate documents where the authenticity of those documents was not in dispute, (id. at 146-47);

- Asking Plaintiff's counsel to remain at counsel table while Defense counsel showed her exhibits, (id. at 158-59);

- Noting, outside the presence of the jury, that the constant disagreements by both counsel was causing the jury to become impatient, (N.T. June 17, 2010, pp. 123, 252-53); and

- Requiring Plaintiff's counsel to ask non-leading questions of her expert. (Id. at 234.)

These comments are nothing more than the Court exercising its duties to manage a difficult trial and rule on objections.[21]

Plaintiff also alleges the Court showed a lack of impartiality in placing settlement negotiations on the record. (Pl.'s Mot. ¶ 27(b).)  Plaintiff's counsel has again misrepresented the record.

Settlement discussions in this case were ongoing, and at the request of Defense counsel in the middle of trial, the Court agreed to take one last stab at resolving this matter.  As part of these

---

[21] We also stand by our view that crying in an ex parte conversation to a Judge's law clerk about how a trial continuance may affect a lawyer's personal life, is unprofessional.  We find it offensive that Plaintiff's counsel has accused the Court of sexism in expressing this view.  (See Pl.'s Mot. ¶ 27(b) n.3.)

discussions, the Court requested each counsel keep the settlement proposals confidential, and advised that, <u>during the course of the discussion</u>, specific numbers would not be disclosed unless the Court viewed that to be productive.  It soon became apparent to the Court that settlement of the matter was not realistic.  When we returned to the courtroom, the Defense settlement offer was placed on the record outside the presence of the jury.  (N.T. June 17, 2010, pp. 3-6.)  As this information did not pertain to anything Plaintiff had told the Court, we are at a loss as to how this issue warrants a new trial.

While it is completely accurate that the Court viewed the total compensation offered to Plaintiff through workers' compensation ($200,000–paid) and the discrimination claims ($150,000–offered) to be an overassessment of the value of Plaintiff's claims, we certainly disagree that Plaintiff's refusal to conclude this litigation for that amount somehow influenced our rulings in this matter.  We extended every courtesy and benefit of the doubt to Plaintiff and, as noted previously, allowed her counsel much greater latitude than Defense counsel thought was permissible.

Plaintiff also accuses the Court of finding "extensive and unfounded fault with plaintiff's counsel so as to make it difficult for her to present the plaintiff's case." (Pl.'s Mot. ¶ 27(c) (improperly designated as ¶ 27(b).)  She further alleges that the Court commented on testimony "in a way designed to help the defendant win its case" and that the "lack of judicial demeanor was evidenced in front of the jury by its facial expressions and clear visual clues of his dislike of plaintiff's counsel." (<u>Id.</u>)  These allegations are not only incorrect and unsubstantiated, but are also extraordinarily insulting.  They further demonstrate Plaintiff's counsel's apparent inability to reflect on her own inappropriate behavior.

Lastly, I note that criticism of counsel was in no way as one-sided as Plaintiff's counsel

portrays.   A fair reading of the record reflects numerous occasions where Defense counsel was reprimanded.   (See e.g., N.T. June 17, 2010, p. 123 (". . . I cannot delay this trial any longer, due to th[e] constant and incessant disagreements by counsel, and inability to, in my view, present any type of coherent dignified presentation to . . . this jury."); N.T. June 18, 2010, p. 295 (". . . this whole issue is created, in my view, due to the unparalleled level of unprofessionalism and contentiousness between these two counsel . . . . I continue to believe, I could be wrong, the Jury clearly sees it and they're clearly disgusted with both of you, clearly[.]"))   The contentious relationship between counsel and the constant objections from both sides made this a long, unpleasant trial.   Importantly, all of the discussions regarding both counsel's conduct were addressed outside of the jury's presence, and thus, such criticism does not warrant the grant of a new trial.

## VI.   CONCLUSION

For the reasons stated herein, Plaintiff's motion for a new trial will be denied.   Our Order follows.